| | |
|---|---|
| 1 | Your Name:  Veronica Tunucci |
| 2 | Address:  P.O. Box 29448 |
| 3 | San Francisco, CA  94129 |
| 4 | Phone:  415-259-8944 |
| 5 | E-mail:  vtunucci@yahoo.com |
| 6 | Pro Se Plaintiff |

**FILED**

JAN 30 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Division *[check one unless 1ˢᵗ complaint]*: ☐ San Francisco ☐ Oakland ☐ San Jose ☐ Eureka

Veronica Tunucci

Plaintiff,

vs.

City and County of San Francisco

Defendant.

Case Number: **CV23-0424 LB**

**COMPLAINT OF EMPLOYMENT DISCRIMINATION, RETALIATION & WRONGFUL TERMINATION**

DEMAND FOR JURY TRIAL *[check one]*

Yes ✔ No ☐

COMPLAINT
PAGE  1 of 52

**PARTIES**

1.    **Plaintiff.** Veronica Tunucci

---

2.    **Defendant.**

Name:        City and County of San Francisco

Address:     Office of the City Attorney

             1390 Market Street, 5th Floor, San Francisco, CA  94102-5408

Telephone:   (415) 554-3846

---

**JURISDICTION**

3.    My case belongs in federal court under federal question jurisdiction based on:

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17

  *[for claims of discrimination based on race, color, national origin, religion or sex]*

- Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

  *[for claims of retaliation]*

---

**VENUE**

*The counties in this district are: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, San Francisco, San Mateo, Santa Clara, Santa Cruz, and Sonoma.  If one of the venue options below applies to your case, this District Court is the correct place to file your lawsuit.  Check the box for each venue option that applies.*

4.  Venue is appropriate in this Court because *[check one or more that applies]*:

☑ a substantial part of the events I am suing about happened in this district.

☐ I am suing the U.S. government, federal agency, or federal official in his or her official capacity <u>and</u> I live in this district.

**INTRADISTRICT ASSIGNMENT**

*Write in the county in which the events you are suing about happened. This District has three divisions. The San Francisco/Oakland division covers Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, and Sonoma counties.*

COMPLAINT
PAGE  2 of 52

5. Because the events happened in the County of San Francisco, this case should be assigned to the San Francisco/Oakland Division of this Court.

## STATEMENT OF FACTS

6. I was hired by the City and County of San Francisco Police Department on April 28, 2014. On January 2, 2018, I transferred and was promoted to a Recorder Division Supervisory position in the City and County of San Francisco's Office of the Assessor-Recorder. During the relevant time period, January 2, 2018 through March 18, 2022, I was employed by Defendant as Recorder Division Supervisor in the Defendant's constituent department, the Office of the Assessor-Recorder ("ASR"), and reported to Kurt Fuchs ("Fuchs"), ASR Recording and Transactions Manager. My job responsibilities included the direct supervision of ten employees and the daily oversight of the Recorder Division operations and the recording of approximately 500-700 legal documents per day for all City departments, title companies, lawyers, financial institutions and the public and maintenance of those public records. I was responsible for planning, assigning, scheduling, training and monitoring the work of Recorder Division staff. I was also responsible for interpreting, implementing and administering existing policies, rules and regulations, and State and local laws related to Recorder operations.

7. I made complaints and filed charges with the Equal Employment Opportunity Commission (and the California Department of Fair Employment and Housing) regarding Defendant's conduct on or about November 3, 2018, March 23, 2020, December 16, 2020 and April 15, 2022. *See* Exhibit B, attached and incorporated hereinafter.

8. From my hire date, Fuchs constantly publicly berated Edward Smith ("Smith"), a black employee, over 60 years of age, who reported to me, in front of department staff. Fuchs told me shortly after my hire date, that Smith reported an incident to the Sheriff's Department, where Smith alleged Fuchs assaulted Smith. Both Fuchs and ASR Human Resources Senior Analyst, Gerald Buss ("Buss") described this incident to me as incredulous, yet no investigation on the alleged incident was conducted. Fuchs made numerous false accusations on Smith's work without evidence, humiliating Smith in front of his co-workers and subsequently damaging Smith's working relationship with co-workers. Fuchs gloated to me how he "watched Smith" and he assigned

COMPLAINT
PAGE 3 of 52

Smith's desk strategically to constantly scrutinize Smith. Fuchs constant stare and glare at Smith was intended to intimidate and created a hostile work environment. Fuchs engaged in these intimidation tactics with various employees including me. Fuchs denied Smith's request for an alternate work schedule citing and mocked to me "he's a little old to have a child". Smith's request for an alternate schedule was to pick his granddaughter from elementary school, not his child.

9.  Approximately one month after my hire date, between February 9th through February 25th, 2018, I sat in on employee performance reviews and witnessed employee interactions with my manager, Fuchs, that were hostile, abusive and what appeared to be disparate treatment to some employees as retaliation and favoritism for others. Gladys Sanchez, a Hispanic woman, over 40 years of age, was aggressively snapped at and shut down when she reported her co-worker was now arriving on time. Fuchs inconsistently applied Department policies on arrival time, sick time, alternate work schedules and break times based on a retaliatory animus and favoritism.

10.  On March 27, 2018, I witnessed and documented my manager, Fuchs' assault on Fanny Troung ("Troung"), an Asian employee, over 60 years of age, who reported to me. I reported this incident immediately to the Department's Human Resources Senior Analyst, Gerald Buss ("Buss"). Fuchs aggressively approached Truong as she worked the public counter to record documents, his face, dark red with anger. Fuchs stood against Truong's chair and aggressively threw the computer equipment and cash register drawer towards Ms. Troung as she cowered in silence. Fuchs is over six feet tall, Caucasian, not slight in stature and Troung is petite in stature, approximately five feet three and Asian. I have approximately twenty years of management experience, including holding a position of Director of Trust Operations at Charles Schwab & Co., Inc., and have never witness such a gross abuse of power and authority. I was stunned and speechless. This illegal conduct was never investigated by ASR, nor the City's Human Resources Department or the City's EEO Department. I never received a Notice of Investigatory Interview, nor did Joe Lee, a Recorder Division co-worker, who witnessed this incident. *See* Exhibit C, attached and incorporated hereinafter (my contemporaneous documentation on the incident).

11.  In March and April of 2018, I reported to the ASR's Human Resources Manager, Jonathan Nelly ("Nelly"), and to Fuchs' supervisor, Douglas Legg ("Legg"), the offensive,

COMPLAINT
PAGE 4 of 52

1    aggressive, hostile behavior from Fuchs to various employees of color who reported to me and stated

2    to both "if the behavior isn't racism, it's at a minimum culturally insensitive".

3        12.    On April 13, 2018, I met with Fuchs' supervisor, Legg, to report my observations to

4    date and detailed my manager's bullying and silencing of employees. I also raised Fuchs' potential

5    substance abuse incident I witnessed on April 6, 2018. I was concerned for my safety and the safety

6    of employees in the Division. Legg's assessment on Recorder Division staff was verbatim from

7    Fuchs narrative on the same employees. *See* Exhibit D, attached and incorporated hereinafter (my

8    email to Buss on alleged substance abuse).

9        13.    Throughout the month of August 2018, Fuchs intensified his overbearing scrutiny of

10   Smith without cause. Fuchs integrated assistance from another ASR Manager, Derek Ah'Nin

11   ("Ah'Nin"), ASR Manager of Public Service, in this excessive scrutiny of Smith. On August 8,

12   2018, Ah'Nin asked me to come with him to Smith's desk. Ah'Nin did not provide any background

13   for the visit. Upon reaching Smith's desk, Ah'Nin ordered Smith to open up all his personal desk

14   drawers to see what was inside, he ordered him to move his personal items and to use the drawers for

15   document storage. There were three large empty drawers in the middle of the mail area in the direct

16   vicinity of Smith's desk that were already assigned for document storage. Julia Levia and Andre

17   Guillory, Smith's co-workers witnessed this encounter. I was stunned as no other employee had

18   ever been subjected to such hostile and disparate treatment and Ah'Nin was not in Smith's direct

19   chain of command. I followed up with an e-mail on August 9, 2018 to ASR Human Resources

20   Manager Nelly and ASR Human Resources Senior Analyst, Buss.

21       14.    On August 27, 2018, Fuchs in an email to me and Smith, documented a falsified,

22   disparaging assessment of Smith's work performance and made unfounded accusations about

23   Smith's work. I sent a response to Fuchs email to correct his false assertions. Fuchs called me into

24   his office and accused me of undermining his authority. He was angry, hostile and intentionally

25   intimidated me with an aggressive, angry stare/glare as he leaned across the table. I have never

26   witnessed such an overt, intentional act of intimidation; this was an unspoken threat with deliberate

27   intent. Other women under Fuchs' management were subjected to this same intimidation tactic.

28   Fuchs intentionally left the door open between his office and Ah'Nin's office during this encounter.

COMPLAINT
PAGE  5 of 52

I felt constant pressure by Fuchs and Ah'Nin to scrutinize Smith's work without cause. *See* Exhibit E, attached and incorporated hereinafter (Fuchs email on Smith's work performance, my response and escalation to ASR HR).

15.    On October 9, 2018, in a meeting with Fuchs, Nelly and Legg, I made a good faith charge of racial discrimination on behalf of staff members who reported to me, including Fanny Troung and Edward Smith. I felt Fuchs treatment of employees of color in the Department was demeaning, and gave the implication that these employees were not worthy of basic respect; and created an environment that was hostile and not inclusive. Fuchs lacked basic management skills, created a hostile environment that was abusive. In this same meeting, I reported to both Legg, Fuchs and Nelly that Fuchs blocks my work suggestions and sabotages my project requests. Fuchs falsely claimed in the meeting he blocked my project presentation to senior management because I didn't obtain his approval. I then read aloud in the meeting, from my contemporaneous notes, the reasons Fuchs provided to me for blocking my presentation, "not worth the effort", "would create too many false positives". Fuchs then blurted out in anger in the meeting: "you're not going to get credit for all my hard work". The benefit of my proposed project was to mitigate risk, improve public service and promote operational efficiency for the entire organization. Fuchs pattern of false accusations, mischaracterizations of events and details and abhorrent management skills were displayed in real time in this meeting with Legg and Nelly and evident in my previous documentation of the ten months under his supervision. I believed Fuchs actions were motivated in discriminatory animus and in my supervisory role, I was required to report the activity to management and human resources according to City and Department Policies and Procedures. Based on my prior management and work experience and my morals/ethics, I believed my failure to do so, would be complicity or potential culpability in illegal behavior. I reported the incidents and made a good faith charge of discrimination to distance myself from what I felt was illegal and unethical behavior and harassment. While Fuchs did not use racial slurs in his dealings with Smith, his continued behavior of aggression and hostility towards Smith, after my continued feedback that the behavior was "culturally insensitive", showed Fuchs' total disregard of racial disparity and the history of racism and discrimination against Black people in the United States.

COMPLAINT
PAGE 6 of 52

16.   On October 15, 2018, I followed up with the Department's Human Resources Manager, Jonathan Nelly, to file the discrimination charge. On October 18, 2018, I again made a complaint to Fuchs and Ah'Nin and met with the Department's Human Resources Senior Analyst, Buss, to discuss the discrimination charge at his request. On October 19, 2018, Buss filed a charge with DRH EEO on my behalf. I was not given the details of this charge until December 2021. Buss states in the charge he did not believe the alleged incident of assault on Troung warranted further investigation. The Department never opened an investigation on the incident, did not interview me or Joe Lee, the other staff member who witnessed the incident. The Department never opened an investigation regarding Edward Smith or any other employee. *See* Exhibit F, attached and incorporated hereinafter. (Charge of Discrimination).

17.   On October 26, 2018, Buss conducted an aggressive, hostile meeting with me and gave me a verbal warning. Fuchs sat in on the meeting and did not speak. Buss would not let me speak or defend myself on a myriad of accusations. Buss stated to me to "move on" and never communicated what he intended by that inappropriate comment. I engaged in protected activities, under EEOC participation and opposition clauses, and I specifically communicated these events to Buss and less than one week later, Buss gave me a verbal warning. Buss never investigated my reported incident of Fuchs' assault on Fanny Troung, made in March of 2018, a violation of City and County of San Francisco policies and procedures. Prior to my employment, other Department employees made similar reports of Fuchs engaging in aggressive, illegal behavior, including prior EEOC Complaints.

18.   On October 29, 2018, I documented the grossly inappropriate, threatening, abusive and retaliatory tone of my "verbal warning" meeting in an email to Nelly and Buss and made a Charge of Retaliation for making a good faith complaint of discrimination, a protected activity. Buss never interviewed me about the alleged incidents in the verbal warning. Buss acknowledged my e-mail, did not deny my account of the meeting, and stated he forwarded my charge of retaliation to the City's DHR EEO Division. *See* Exhibit G, attached and incorporated hereinafter (my contemporaneous email documentation on the verbal warning).

19.   On October 30, 2018, Fuchs followed up with an email detailing the Department's version of the verbal warning, including citing e-mails where I engaged in legally protected

COMPLAINT
PAGE 7 of 52

1    activities, charges of discrimination and harassment, protected activities under EEOC participation

2    and opposition clauses.  I was not permitted to respond to any of the accusations made.  There was a

3    disproportionate response to my complaints/charges versus Fuchs' and Ah'Nin's abusive behaviors

4    and disparate treatment towards Edward Smith, Fanny Troung and other department employees and

5    displays an inherent gender bias towards me.  I received a verbal warning for alleged "emails with an

6    accusatory and chastising tone" and alleged "public outbursts" and Fuchs was not investigated for

7    aggressive, violent and illegal behavior.  Hearsay incidents from third parties were included in the

8    verbal warning documentation, not investigated and one additional incident occurred over two

9    months prior and the details intentionally misconstrued with known mitigating circumstances

10   omitted.  This alleged "verbal warning" highlights the inability of the Department and the

11   Defendant, the employer, the City and County of San Francisco to address complaints of alleged

12   discrimination.  A professional organization would thank the employee for raising their concerns and

13   make a concerted effort to resolve the issues raised and protect the employee from retaliation.  The

14   Department by contrast, never acknowledged the issues I raised, just disparaged the manner in which

15   I communicated the issues and made a concerted effort through punishment to silence me.  The

16   Department failed to account for or address the situational circumstances surrounding these alleged

17   incidents.  The Department openly silences me with total disregard of City, State, Federal laws,

18   statues and policies and without any consequences, creating a chilling effect.

19        20.    There is a direct, causal link, including temporal proximity between my protected

20   activities (Charges of Discrimination on October 9, 2018, October 15, 2018 and October 18, 2018)

21   and the verbal warning by the Department's Human Resources Department, Buss, on October 26,

22   2018.

23        21.    On November 30, 2018, Fuchs without any communication or investigation, handed me

24   a written warning at approximately 4:45p.m., the close of the business day on a Friday.  Fuchs then

25   smiled from ear to ear and turned his back to me, clearly a sign of retaliation, rather than a legitimate

26   reason for discipline.  Fuchs failed to investigate the incident and failed to provide constructive

27   feedback or coaching.  Ah'Nin sent me an email with accusations and made untrue assertions, when

28   I responded, I was reprimanded for making accusations, yet the male manager, Ah'Nin, engaged in

COMPLAINT
PAGE  8 of 52

the same accusatory behavior without reprimand or consequences, disparate and biased treatment that I attribute to gender bias.   When the City's EEO Department questioned my manager on the written warning, he responded "Tunucci's e-mails are robust", which appears to be a gender biased characterization and not "*Just Cause*" for discipline as required by my collective bargaining agreement ("CBA").  The written warning describes my behavior in "gender biased" terms, such as "chastising, accusatory", yet Ah'Nin, the male manager, who made chastising, untrue accusations is deemed credible and appropriate.  The lack of an investigation by ASR supports a predetermined decision to discipline me that can only be attributed to retaliation.  ASR without investigation or evidentiary documentation, discriminately and unjustly, determine my facts are "allegations" and Ah'Nin's "allegations" are facts and disciplines me without due process.  I reported this disparate treatment to Nelly on December 4, 2018 and made a claim of discrimination (gender-female), retaliation and harassment for filing the DHR EEO complaint.  *See* Exhibit H, attached and incorporated hereinafter (my contemporaneous documentation on the written warning).

22.    There is a direct, causal link, including temporal proximity, between my protected activity (Charge of Retaliation on October 29, 2018)  *See* Exhibit I, attached and incorporated hereinafter (Charge of Retaliation).and the written warning handed to me on November 30, 2018 without investigation, a violation of City and my collective bargaining agreement ("CBA") procedures (*No action to impose discipline against an employee shall be imitated more than thirty (30) days from the date the City knew of the conduct and has completed a diligent and timely investigation)* and violation of my CBA that all discipline shall be for '*Just Cause*".

23.    On April 22, 2019, the City's Department of Human Resources EEO Department ("DHR EEO") administratively closed my complaint of discrimination without an investigation and without interviewing one employee named in my complaint and stated "Except for an authorized representative, no person may file a charge on behalf of someone else."  The statement is contrary to City policies and procedures and my supervisory role, "*if a supervisor becomes aware of potential discrimination, harassment, or retaliation, the supervisor must immediately report it to the department's Equal Employment Opportunity (EEO) or Human Resources personnel.*"  *See* Exhibit J, attached and incorporated hereinafter (Notice of Charge of Discrimination Closed by DHR EEO).

COMPLAINT
PAGE  9 of 52

24.    During April 2019, I attended Recorder Division data conversion project meetings conducted by our vendor, Avenu, with Fuchs, Ah'Nin and Sean Finley, ASR IT Director.  As I contributed to the meeting and answered the vendor's questions, ASR Management's response to my contribution was dismissive, despite my experience and expertise on the topic and their behavior felt discriminatory.  I was interrupted and talked over in these meetings and other professional settings, and this further contributed to my perception that my communication was less valuable than my male colleagues; disparate treatment.

25.    DHR EEO sent me a Charge of Retaliation to sign on June 3, 2019.  I signed and submitted back to DHR EEO on June 4, 2019.  On June 6, 2019, the Department (Carmen Chu, Assessor-Recorder and Rachel Cukierman, Deputy Director Administration and Finance, including ASR HR) was notified by e-mail of my charge.  *See* Exhibit K, attached and incorporated hereinafter (DHR EEO Notice to ASR on my Charge of Retaliation).

26.    On June 11, 2019, I met with ASR Human Resources Manager, Nelly, and described what I believed was heightened retaliation by Fuchs; two hostile, aggressive, one-on-one meetings after my complaint of discrimination was closed by DHR EEO and I filed a Charge of Retaliation.  Nelly stated I didn't have a case since my claim was not a protected category.  *See* Exhibit L, attached and incorporated hereinafter (Email to DHR EEO, my meeting notes with Nelly).

27.    On June 14, 2019, Nelly provided me with a Notice of Proposed Five (5) Day Suspension for insubordination and unprofessional conduct.  The Department falsified the charges, omitted evidence that contradicted the charges, and grossly misrepresented the facts surrounding the charges.  Rachel Cukierman "Cukierman" included one false charge of insubordination.  Cukierman had direct knowledge of my Charge of Retaliation on June 6, 2019, had direct oversight of ASR Human Resources, and included a falsified charge of insubordination.  Cukierman included an e-mail where she asked for my "help" on several items on May 17, 2019.  I responded on May 20, 2019, where I could help and where I may not be effective.  Rachel included these two exchanges in the charge of insubordination, but failed to include her final e-mail on May 28, 2019, as agreement to accept my help as indicated in my e-mal.  *See* Exhibit M, attached and incorporated hereinafter (full e-mail chain with Cukierman, including final response on May 28, 2019).  In addition, Fuchs

COMPLAINT
PAGE  10 of 52

1   included a falsified charge of insubordination and another charge of unprofessional conduct from an

2   incident on May 17, 2019.  Fuchs fabricated an alternate account of the events that transpired to

3   incriminate me.  This alleged insubordination, involved recording a land deed that completed the

4   Defendant's negotiations of a land parcel purchase from a member of the public in San Francisco.

5   This negotiation involved numerous City Departments, full approval of the Board of Supervisors and

6   Mayor London Breed.  Deeds were drafted and approved by City and County of San Francisco City

7   Attorneys for the Recorder Division to record.  The acquisition was an eminent domain purchase,

8   Defendant was acquiring private property to build an access road for public use.  Fuchs falsely

9   charged his determination "no provision to record" was a directive to not record this deed.  "No

10  provision to record" is a legal determination made daily by Recorder Division staff under my

11  supervision and in this case, his determination was incorrect as the Board of Supervisors and Mayor

12  London Breed signed a City and County of San Francisco Resolution No. 133-19 that provided the

13  provision to record.  *See* Exhibit N, attached and incorporated hereinafter (Resolution signed by

14  Mayor London Breed and City Project Manager, Hearing Transcript notes validating the Deed). My

15  conduct was lawful, furthered the business interests of the City and County of San Francisco, was in

16  the interest of the public, and completed a City directive.  Fuchs intentionally mispresented the facts,

17  withheld information and in my Five (5) Day Suspension hearing under oath, committed perjury.

18  Only after receiving my Charge of Retaliation on June 6, 2019, did Cukierman and Fuchs charge me

19  with insubordination on alleged incidents one month prior, and Cukierman had her ASR Human

20  Resources Manager, Nelly, deliver my Notice of Five (5) Day Suspension on June 14, 2019 without

21  conducting an investigatory interview per City and my CBA procedures.  Cukierman had a conflict

22  of interest in her ability to use her ASR Human Resources staff to inflict punishment and retribution

23  on me for anything she deemed inappropriate, and she successfully did.  Cukierman signed off on

24  both my Five (5) Day and Fifteen (15) Day Suspensions.  The Department engaged in vindictive,

25  malicious and egregious retaliation in violation of the anti-retaliation provision of Title VII of the

26  Civil Rights Act of 1964, 42 U.S. C §§2000e, *et seq.*  I engaged in protected activity on June 3,

27  2019, the Department was notified on June 6, 2019 and the Department provided me with a Notice

28  of Proposed Five (5) Day Suspension ("Skelly Notice") on June 14, 2019 with falsified charges of

COMPLAINT
PAGE 11 of 52

insubordination and unprofessional conduct.  No investigation was completed prior to issuing the Notice of Proposed Suspension in violation of City and CBA policies and procedures.  This was a clear attempt to unjustly incriminate me with false statements and gross misrepresentation of the events not supported by the evidence, creating a chilling effect and a clear message to silence me. This suspension was motivated only by retaliatory animus, was illegal, malicious and oppressive and done with a willful and conscious disregard of my rights.

28.    On June, 17, 2019, I emailed Douglas Legg on a violation of California Recording Requirements as codified in California Recorder Government Codes.  Fuchs presented Arlene Mizuhara ("Mizuhara"), a Recorder Division Examiner, who reports to me, a Notice of Delinquent Real Property Transfer Taxes document to record.  Mizuhara notified Fuchs; the document did not meet Recording Requirements without a signature.  Fuchs directed Mizuhara to record the document without a signature.  Mizuhara, a thirty (30+) year tenured and experienced employee, in the Division, escalated this incident to me.  On May 16, 2019, Fuchs presented me with another Notice of Delinquent Real Property Transfer Taxes document to record without a signature.  I mentioned again, the deficiency of the document without a signature and not meeting California Recording requirements.  Fuchs again directed me to record the document without signature.  I escalated this to Legg on June 17, 2019.  On June 25, 2019, Legg responded in relevant part:  "You are instructed not to send emails when you don't agree with decisions being made by your manager or other staff members regarding processes or projects."  This is in direct violation of Whistleblower laws.  In my previous employment as Manager and Director at Charles Schwab & Co., Inc., I would have been terminated if I gave an employee this directive.  ASR used this illegal directive as basis for my Fifteen (15) Day Suspension as their charge of "Failure to Follow Instructions".  This directive was given to me solely, was disparate treatment and violates the City Whistleblower policy.  I began to equate ASR with Bizarro World, a metaphor to describe ASR and this situation as the exact opposite of what is expected or "normal".

29.    On July 18, 2019, a *Skelly* Hearing was held for my 5-Day Suspension.  The Department submitted a revised timeline and revised allegations after the *Skelly* Hearing and the *Skelly* Officer (a City Department of Human Resources Manager), closed the record.  I was not

COMPLAINT
PAGE  12 of 52

afforded the right to respond to the new allegations or timeline, a violation of *Skelly* and due process. The Department's misconstrued account of events, revised timing and exclusion of evidence, gives further proof the Department acted with intended animus and malice. The *Skelly* Officer upheld the charges and my five (5) day suspension was imposed September 16 through September 20, 2019. Cukierman signed off on my Five (5) Day Suspension, acted in a unilateral and arbitrary manner, bypassing established procedural safeguards and with intended animus and malice. This suspension was a clear attempt to punish me, creating a chilling effect and a clear message to silence me.

30.    On September 9, 2019, I updated my Charge of Discrimination/Retaliation to include my 5-Day Suspension. DHR EEO rejected my 1st update where I included details of an incident where Fuchs was aggressive with staff and created a hostile, abusive environment in the Department. This sends a message to Complainants that the City does not investigate incidents of bullying and intimidation, despite City policies against bullying. I deleted the details of this incident and resubmitted the Charge to DHR EEO. The Department (Carmen Chu and Rachel Cukierman) was notified of my Amended Charge of Discrimination/Retaliation on September 13, 2019. *See* Exhibit O, attached and incorporated hereinafter (Notice to ASR of my Amended Retaliation Charge to include my 5-Day Suspension and my 1st Amended Charge with hostile incident rejected by DRH EEO).

31.    On September 9, 2019, Smith was interviewed by the Office of the City Attorney Investigator, Blanche Blachman ("Blachman"), regarding a lawsuit filed by two prior black employees, Sandy Pubill ("Pubill") and Marion Banks ("Banks"), who were terminated by the Office of the Assessor-Recorder in December 2016 and January 2017, prior to my employment in the office. Smith reported back to me that the City Attorney Investigator Blachman interviewed him extensively about me and took multiple pages of notes on me. I never met, nor did I have any knowledge of Pubill and Banks being terminated prior to Smith returning from his interview with Blachman and informing me of Blachman's inquiries about me. Pubill and Banks alleged they were terminated based on their race (black) and their complaints about ASR's harassment and discrimination. *See* Exhibit P, attached and incorporated hereinafter (Request for Smith to interview with Blachman & Pubill/Banks court case coversheet). I questioned one Department employee

COMPLAINT
PAGE 13 of 52

about Pubill and the Caucasian employee stated, "you know, she talked black". The employee, so ignorant of racist behavior, freely made this statement to a supervisory employee. This same employee stated regarding the Black Lives Matter movement, "I wish they would just add "TOO" to the end of Black Lives Matter. This is indicative of the Department's need of racial sensitivity training by both management and staff; a message I attempted to provide to the Department from my initial start date, as "cultural sensitivity".

32.    On September 10, 2019, I met with Douglas Legg and Jonathan Nelly and discussed the falsified incidents in my Five (5) Day Suspension and bullying by Fuchs.

33.    In September and October of 2019, the Department and the Office of the City Attorney denied me an Arbitration hearing on my 5-Day Suspension, in violation of my CBA. *See* Exhibit Q, attached and incorporated hereinafter (ASR & City Attorney Arbitration Requests Denied).

34.    On November 4, 2019, I notified Cecilia Mangoba, Deputy City Attorney, regarding the false narrative of the events in my 5-Day Suspension and the evident retaliation. My union filed a grievance on behalf of their members and on November 27, 2019, the City Attorney's Office agreed to allow me to proceed to schedule a hearing with the City Attorney Office and a "neutral" third party hearing officer. The Union agreed to pay their share of costs for the hearing, however, declined to represent me in violation of PERB collective bargaining statues and the right to representation. *See* Exhibit Q, attached and incorporated hereinafter (My email to City Attorney, DHR EEO, ASR HR and Carmen Chu, Assessor-Recorder, regarding false narrative of the events in my 5-Day Suspension).

35.    On October 21, 2019, I received a new Notice of Investigatory interview from Buss. On October 24, 2019, I responded to Nelly and Buss via e-mail and stated "The standards applied to Kurt's conduct are very different than the standards applied to my conduct, from my vantage point it feels like gender discrimination and misogynistic behavior." I was constantly criticized for my communication style, even when it was effective, while Fuchs and other male employees were praised or validated for the same style. *See* Exhibit R, attached and incorporated hereinafter (Gender Discrimination claim to ASR HR and DHR EEO).

COMPLAINT
PAGE  14 of 52

36.    On November 5, 2019, I participated in the Investigatory interview and reported gender discrimination and misogynistic behavior.  I reported disparate treatment and the different standards applied to Fuchs and other male employees.  I was held to different and higher standards than my male colleagues, criticized and evaluated more harshly and experienced discrimination based on gender stereotypes.  I was disciplined because I present myself in a way (assertive, competent and independent) that doesn't conform to traditional, female gender stereotypes.  Several of my staff members were interviewed in this investigation.  All stated both Fuchs and I engaged in similar behavior in a Department Procedure meeting, normal discourse during procedure review, yet ASR HR only investigated me.

37.    On January 8, 2020, I received another Notice of Investigatory interview without notice of closure of the November 5, 2019 investigation.  The interview was held on January 17, 2020.  I was continually threatened and intimidated with progressive discipline, excessive investigations, and libelous, exhaustive documentation by the Department, papering my file.  This interview centered around four e-mails I sent, yet my Notice of Proposed Fifteen (15) Day Suspension included Exhibits A through Z, excessive documentation to paper my file and overwhelm me with excessive documentation with implied intention of intimidation to silence me through abusive and malicious, increasingly severe retribution, as I prepared for my Five (5) Day Suspension Arbitration hearing (originally scheduled for March 19th & 20th 2020, delayed on March 16th, 2020 by the City Attorney, due to Covid 19 and rescheduled to June 25th & 26th 2020).

38.    I participated in a "protected activity", filing an Amended Charge of Retaliation on September 9, 2019, and there is a causal connection between the protected activity and resulting adverse employment actions:  (1) denial of an expedited arbitration hearing, 1st by ASR, then by the City Attorney's Office on October 31, 2019, (2) two back-to-back, misconduct investigations, (notice on October 21, 2019, interview on November 5, 2019 & notice on January 8, 2020, and interview on January 17, 2020, (3) inaction on my charge of discrimination on my protected class, gender, (4) Notice (February 4, 2020), *Skelly* Hearing (February 24, 2020) and imposition of Fifteen (15) Day Suspension (June 1-12, June 24-30).

COMPLAINT
PAGE  15 of 52

39.    The retaliatory nature of the Fifteen (15) Day Suspension is evident as not one incident rises to the level of discipline, especially, a severe 15-Day Suspension.  The charges included: (1) Failure to Follow Instructions, (2) Unprofessional Conduct and (3) Inappropriate Communication. The Department engages in a continual pattern in "shooting the messenger" and disparaging my communication as I shed light on Fuchs' gross mismanagement in staffing schedule, inappropriate communication, illegal procedures and discuss Cukierman's fraudulent representation of my 5-Day Suspension.  This 15-Day Suspension, disciplines me for:  (1) contacting the City Attorney's Office on an illegal procedure Fuchs implemented in violation of Probate code and a matter of public privacy, (2) reporting Fuchs inappropriate, false, accusation made to me in public, (3) escalating an employee's claim of intimidation by Fuchs, Ah'Nin and our Department's assigned City Attorney for business related matters, and (4) escalating critical staff shortages on critical job functions caused by Fuchs' vendor training schedule.  On January 28, 2020, Fuchs e-mailed to the Recorder Division that the City Attorney determined that the incident listed in (1) above, did, violate Probate code, yet the Department still included the incident in the Notice of 15-Day Suspension, upheld the charge in the *Skelly* Hearing and the "neutral" Arbitrator, still upheld the charge and included in my 15-Day Suspension "Award".  *See* Exhibit S, attached and incorporated hereinafter (Notification to City Attorney on unlawful procedure and Fuchs confirmation).The Department took a deliberate leap from a 5-Day Suspension to a 15-Day Suspension, the fast track to eventual retaliatory termination and violated my CBA, all discipline shall be for *"Just Cause"*.  Every attempt I engage in to restore my reputation, participate in a hearing to clear my name, is met with increasingly severe retribution and harassment by the Department and Fuchs.  The alleged "misconduct" is simply pretext for disciplining me for engaging in my protected activities.  These "set-up" investigations into my alleged misconduct are adverse employment actions, as I have sustained periods of depression, anguish and it materially affects my job performance, mental and physical health.

40.    On January 25, 2020, I filed a complaint with EEOC on retaliation and discrimination on the basis of protected class, gender.  I signed the official Charge of Discrimination with EEOC on March 23, 2020.  On April 7, 2020, I received notification from EEOC that my Charge of Discrimination was served on the Respondent employer, the Defendant.  *See* Exhibit T, attached and

COMPLAINT
PAGE  16 of 52

incorporated hereinafter (EEOC Charge of Discrimination and Retaliation and Notice Defendant Served).

41.    On February 18, 2020, I walked into the Controller's Office, Whistleblower Division, emotionally distraught. My meeting with representative, Steven Munoz, Senior Auditor, in the Controller's Office, Whistleblower Division, was riddled with a "Whistling in the Dark" conversation and a referral back to DHR EEO and my union. *See* Exhibit U, attached and incorporated hereinafter (my contemporaneous draft email notes).

42.    On May 15, 2020, I received notice of a new Investigatory interview meeting scheduled for May 22, 2020 and then delayed until May 29, 2020. The interview lasted for 3 hours. The Department's investigation included five (5) emails from January 2020, one (1) email and one (1) incident from February 2020, two (2) emails from March 2020, one (1) email from April 2020 and one (1) incident from May 2020. The Department did not provide notice that any of these incidents rose to the level of discipline at the time of the events. This violates my CBA, "*No action to impose discipline against an employee shall be initiated more than thirty (30) days from the date the City knew of the conduct and has completed a diligent and timely investigation, except for conduct that would constitute the commission of a crime.*" And all discipline shall be for "*Just Cause*". I engaged in a protected activity, filing a Charge of Discrimination with EEOC on March 23, 2020, the Department was notified on April 7, 2020 and on May 15, 2020, I received a notice of a new investigation. On May 22, 2020, I received notification that I was suspended for Fifteen (15) Days with a start date of June 1, 2020. ASR Human Resources was notified of my protected activities on April 7, 2020 (EEOC Charge of Discrimination) and May 4, 2020 (arbitration hearing scheduled on my 5-Day Suspension). These notifications show the causal "temporal proximity" to the opening of my investigatory hearing on May 15, 2020 and then the Department's attempt to find a legitimate reason for discipline by their far-reaching attempt to go back months to January, February and March to find cause for the investigation, establish the other causal connection. If not for the notice from EEOC, ASR would not have looked for an opportunity to impose a severe 30-Day Suspension. The incidents in the May 29, 2020 investigatory meeting became the documentation for my Notice of Proposed Thirty (30) Day Suspension issued to me on August 21, 2020.

COMPLAINT
PAGE 17 of 52

43.   On May 20, 2020, I emailed Nelly and complained of continued harassment, retaliation and bullying by ASR.  In addition, I complained about gender discrimination in this email "*This Department views women in gender stereotypes and judges them in that light. . . .*"  I notified Nelly of the severe psychological effect these investigations were having on my mental health.  *See* Exhibit V, attached and incorporated hereinafter (email to Nelly, Buss and my union rep, Criss Romero).

44.   On June 25 & 26, 2020, I represented myself in my 5-Day Suspension hearings with Hearing Officer, Chris Burdick ("Burdick") and City Attorney, Rafal Ofierski, representing the Department.  Cukierman, Fuchs were witnesses and cross-examined by me.  Buss attended the hearing as a representation of the Department.  Both Fuchs and Cukierman provided false testimony in the hearing.  Fuchs committed perjury.  City Attorney, Rafal Ofierski, requested to file a Post Hearing Brief.  Burdick granted his request and this again, put a pro se, like me, at a disadvantage.

45.   On the eve of June 26, 2020, after the conclusion of the evidentiary hearings, I had a mental breakdown and nearly went to the hospital.  The pressure and stress of the past two hearing days came crashing down on me.  The constant attacks by the City Attorney and false testimony by members of the ASR Management team were vicious and malicious with intent to do harm.  The City Attorney's Office engaged and was complicit in the presentation of false charges and testimony and prevented me from receiving a fair trial.  The City Attorney is subject to the ethical rules applicable to lawyers generally (Rules of Professional Conduct of the State Bar of California) in addition to special ethical duties to further justice and not to advance the case of a particular employee, or organization in any particular matter, especially in a civil case. Rule 7-105 of the Rules of Professional Conduct of the State Bar of California requires: "In presenting a matter to a tribunal, a member of the State Bar shall: (1) Employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and shall not seek to mislead the judge, judicial officer or jury by an artifice or false statement of fact or law." As suggested by the American Bar Association, a government lawyer may be under an even higher duty: "A government lawyer in a civil action ... has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results." (ABA Code of Prof. Responsibility, canon 7, ethical

consideration 7-14.) Occupying a position analogous to a public prosecutor, he is "possessed ... of important governmental powers that are pledged to the accomplishment of one objective only, that of impartial justice." (Professional Responsibility: Report of the Joint Conference (1958) 44 A.B.A.J. 1159, 1218.)

46.    On July 13, 2020, six weeks after the Investigatory Interview, the Department added another incident to the Notice of Proposed Thirty (30) Day Suspension and did not conduct an investigation, a violation of my CBA.  The full background on this incident highlights Fuchs retaliatory animus and provides another example of retaliation.  On June 11, 2020, Fuchs was interviewed by DHR EEO and questioned on Gladys Sanchez's ("Sanchez") allegation (included in my Charge to DHR EEO and ASR HR) that he bullied and intimidated Sanchez by pressing his knee into the back of her chair, as he stood behind her at her desk.  On June 12, 2020, the very next day, Fuchs called Buss and requested to extend Glady Sanchez's job class promotion, probationary period, clearly retaliatory animus.  *See* Exhibit W, attached and incorporated hereinafter (documentation supporting Fuchs illegal retaliation against Sanchez).  I followed standard operating procedures and cleared probation for Gladys Sanchez on May 18, 2020 when ASR HR Analyst Kimberly Gibney reached out for me to start the paperwork.  On my return from suspension and vacation, July 13, 2020, I e-mailed Management and ASR HR that based on employee performance, Gladys (as well as other employees) had passed her probation period.  Fuchs did not provide one legitimate reason to delay Gladys' probation period, just falsified, non-relevant justification, clearly retaliatory for Gladys Sanchez.  The Department deemed my communication unprofessional/disruptive and stated in their Notice, "This conduct is yet another violation of the Department's Standard of Conduct Policy, is unbecoming of a 4310 Commercial Division Assistant Supervisor, and reflects poorly on the Department."  The Department further disparages my communication while condoning Fuchs illegal retaliation.  Sanchez indicated to me that she felt she was being punished while I was on my Fifteen (15) Day Suspension and vacation during June through mid-July 2020.  I was unaware of DHR EEO's interview with Fuchs on June 11, 2020 until I was provided the DHR EEO Staff report with the interview notes on December 23, 2021.  This is another example of Fuchs illegal retaliatory behavior and the lack of ability of the Defendant to

1    protect employees against retaliation.  During my absence in this same June 2020 timeframe,

2    Sanchez also reported to me another aggressive, encounter with Fuchs where she was intimidated

3    into tears by a close physical encounter with Fuchs and his unjustified anger.  Another employee,

4    Alisa Loum, witnessed and confirmed this encounter between Fuchs and Sanchez to me, clearly

5    more retaliatory animus by Fuchs.

6        47.    On July 13, 2020, the conclusion of my Fifteen (15) Day Suspension and my vacation,

7    Fuchs would not let me supervise staff in the Office and did not include me on the new Recorder

8    System training conducted in the Office, intended isolation.  I was assigned to staff functions,

9    responding to customer service requests and inquiries.  On the few occasions, I was permitted to

10   come in the Office, Fuchs would stalk me as I navigated the office and eavesdrop on my

11   conversations with staff and co-workers.  Fuchs gave directives to some staff to not talk with me or

12   go to my desk.  *See* Exhibit X, attached and incorporated hereinafter (Retaliation and intended

13   isolation email to Nelly and threat from Nelly).

14       48.    On August 21, 2020, the Department issued their Notice of Proposed Thirty (30) Day

15   Suspension, further documentation with their abusive, falsified, retaliatory discipline and includes

16   numerous incidents that do not rise to the level of discipline.  The Department engages in

17   "gaslighting" my communication which is manipulative, and psychologically abusive.  The

18   Department constantly questions the veracity of my statements and intentions, destroys my

19   credibility and misquotes my statements from investigatory meetings to justify their discipline and

20   includes accusations that are not corroborated by any investigation.  There has never been an intent

21   of wrongdoing on my part in any incident cited by the Department.  I am constantly made the

22   "problem" and disparaged with defamatory documentation, despite Fuchs lack of basic management

23   skills and his violative, abusive behavior.  The Department's unjust discipline creates a distorted

24   sense of right versus wrong and the basic norms in employer-employee relationships. The

25   Department included a January 15, 2020 email in their Notice of Proposed Thirty (30) Day

26   Suspension, sent from me to Nelly, Cukierman and Legg, reporting Fuchs bullying and yelling at

27   me.  Nelly in his Notice of Proposed Thirty (30) Day Suspension, states "neither you nor Fuchs

28   provided any names of witnesses who may have heard Fuchs yell at you, so the Department was

COMPLAINT
PAGE  20 of 52

unable to validate your claim." Nelly's statement is not truthful. I provided Gladys Sanchez as the employee who heard Fuchs yell at me and Sanchez was situated across the Office at the time. Sanchez also provided a written statement as evidence for the *Skelly* hearing. Nelly has never investigated any of Fuchs abusive behavior escalated by me, just threatened me with excessive discipline with the explicit intention to silence me. I also raised this incident in my Investigatory Interview held on January 17, 2020, prior to my Notice of Proposed Fifteen (15) Day Suspension, issued on February 4, 2020 and again in my *Skelly* Hearing held on my Notice of Proposed Fifteen (15) Day Suspension on February 24, 2020. ASR HR and DHR *Skelly* Officers do not hold fair, unbiased investigations and hearings and deem me not credible without investigation. *See* Exhibit Y, attached and incorporated hereinafter (documentation provided to ASR, Union Rep, Fuchs yelled at me).

49.    The Department includes excessive documentation that does not rise to the level of misconduct, and especially a severe Thirty (30) Day Suspension. As an example, the April 2020 email did not violate any policy, procedure or conduct policy; the Department did not have "*Just Cause*" for discipline. I responded to an e-mail from a Title Company and stated, "Hi Hilarion, Kurt and I need to discuss this further. Please hold off until you hear back from us." *See* Exhibit Z, attached and incorporated hereinafter (email exchange with Hilarion, Fuchs and follow up on new procedure). The Department stated "Your conduct violates the Department's Standards of Conduct Policy, is unbecoming of a 4310 Commercial Division Assistant Supervisor, and reflects poorly on the Department." This is a blatant proffered reason to bolster a case for discipline with excessive documentation and pretextual for illegal retaliation. This simple statement is clearly not misconduct under any circumstances and is not "*Just Cause*" for discipline. The Department includes an isolated email within the (30) days required by my CBA. The *Skelly* Officer opined on this incident in her Recommendation to uphold the 30-Day Suspension, that my communication undermined and disrespected my supervisor. This charge is baseless; my only motive was to clarify my understanding of a newly implemented Covid 19 procedure before responding to the Title Company. This clearly shows the DHR *Skelly* Officers are not neutral, justify and "rubber stamp" the Department's proposed discipline. The Department's "Standards of Conduct" Policy states:

COMPLAINT
PAGE 21 of 52

1    "*Employees are expected to demonstrate professionalism in dealing with co-workers, vendors, other*

2    *government agencies, and the public. Employees must communicate clearly and concisely in*

3    *business dealings on behalf of the Department. If conflicts do arise, employees are encouraged to*

4    *immediately notify their supervisor and participate in resolving the situation.*" The policy doesn't

5    define or set standards for "professionalism" or indicate severe retribution may be imposed.

6        50.    In their Notice of Thirty (30) Day Suspension, ASR charged in relevant part: ". . . you

7    disregarded and failed to follow the Public Health Order regarding Shelter-In-Place, and Assessor

8    Chu's directive, emailed on March 16, 2020, that all ASR physical office were closed to the public. .

9    . " Assessor Chu's directive referred employees to their Division Manager or Supervisor for further

10    instructions. I supervised a critical function, and supervised staff in the Office through Covid-19. I

11    met employees from other City Departments and a few members of the public at the door to City

12    Hall to obtain their documents for recording. This was the Covid-19 procedure for other City

13    Departments and a rare exception for the general public. On May 6, 2020, I alerted Fuchs and Legg

14    that I met a member of public at the entrance to City Hall to obtain their document and neither

15    instructed me this was a violation of any policy or procedure or to cease doing this. In addition, the

16    ASR Public Service Supervisor, HoangDung Nguyen ("Nguyen"), the male supervisor, met the

17    public at the same entrance to City Hall to provide document copies. Document copies are not

18    classified as a critical function. This is another example of disparate, discriminatory treatment.

19    Nguyen's supervisor is Ah'Nin who reported to Legg. The Department charged me with "Failure to

20    Follow Instructions", another violation of my CBA that all discipline be for "*Just Cause*". *See*

21    Exhibit AA, attached and incorporated hereinafter (Shelter in Place procedure and Nguyen's mails).

22        51.    My Notice of Proposed Thirty (30) Day Suspension issued to me on August 21, 2020,

23    included many incidents that violated my CBA. I was again threatened and intimidated with

24    progressive discipline, excessive investigations, and libelous, exhaustive documentation by ASR

25    HR, papering my file with intent to overwhelm with excessive documentation with implied intention

26    of intimidation to silence me through abusive and malicious increasingly severe retribution, as I

27    prepared my Post Hearing Brief to defend my case on my 5-Day Suspension Arbitration hearing

28    (held on June 25th & 26th 2020). The Post Hearing Brief was due to the Hearing Officer on

COMPLAINT
PAGE  22 of 52

September 9, 2020.  The original *Skelly* Hearing for the 30-Day Suspension was scheduled to be held on August 28, 2020, then a postponement was granted to September 14, 2020 and the final request to delay until September 21, 2020 granted by the Department.  The Department's Notice of Proposed Thirty (30) Day Suspension was more than 160 pages.  Extensive time was required to refute their falsified charges.

52.    To date, I have not been afforded a neutral Arbitration Hearing by a hearing officer on my Thirty (30) Day Suspension, a violation of my CBA.  Nor has DHR responded to my union's grievance on procedural issues.  On September 21, 2020 and again on December 16, 2020, my union filed a grievance with the City, regarding the "Violation of Article II., Employment Condition, Section 104, with impact to all Manager across all City Departments. *"No action to impose discipline against an employee shall be initiated more than thirty (30) days from the date the City knew of the conduct and has completed a diligent and timely investigation."*  To date no response has been received from DHR and this is another CBA violation. *See* Exhibit AB, attached and incorporated hereinafter (MEA Union notifications to DHR).

53.    On December 4, 2020, Nelly e-mailed me of the Department's decision to suspend me for Thirty (30) Days to be effective Tuesday, January 19, 2021 and end Wednesday, February 17, 2021.  I notified Nelly, I was unable to endure the emotional stress at this time and requested to have the suspension imposed immediately.  Legg agreed and my Thirty (30) Day Suspension was imposed on December 7, 2020 to January 5, 2021.  My emotion distress and anxiety were elevated and I suffered depression to the point I lost all self-worth.  One staff member contacted me regularly during this timeframe and on some days was the only highlight of my day.  This staff member was a previous target of Fuchs retaliatory animus and understood the emotion distress and anxiety I was suffering from.

54.    On December 7, 2020, I contacted DHR EEO to update my Charge of Discrimination to include my 30-Day Suspension.  DHR EEO never responded to nor investigated the Charge.

55.    On December 16, 2020, I filed a Charge of Discrimination to include my 30-Day Suspension with EEOC, Case number 550-2021-00362.

56.    On January 6, 2021, upon my return from my suspension, I was again isolated from staff and co-workers and not allowed to work in the Office, and again assigned responding to customer service requests, a staff function.  Again, I strived to work harder.  The customer service requests volume increased exponentially during this time frame due to the financial consequences of Proposition 19 passing.  I answered service requests from 7:00 am until after 5:00pm on most days. Our recording volume increased 100 percent.  During this time, service standards exceeded all expectations and I received numerous compliments on my service from the Public.  Fuchs assumed responsibility of creating the Staff Office schedule, my job responsibility.  When I was allowed in the office, Fuchs would eavesdrop on my conversations with employees, conspicuously stalking me as I navigated around the office.  This unwarranted behavior was observed by co-workers and a vendor working on-site.  *See* Exhibit AC, attached and incorporated hereinafter (email on isolation from Office and exclusion from meeting where my work was presented).

57.    On January 21, 2021, Criss Romero, MEA Senior Labor Relations Representative, sent a letter to Burdick, in part stated: ". . .it is unacceptable and unconscionable that you have yet issued a decision on Ms. Tunucci's 5-day suspension.  Most CCSF MOU's require suspension of this short length of time to be submitted to an expedited arbitration process, with a bench decision issued at the end of the hearing; followed by a written decision within a week.  Unfortunately, the MEA MOU required mutual consent by both parties to allow any matter to be heard in the expedited arbitration process and the Assessor-Recorder (Department) did not consent to an expedited process.  You informed Ms. Tunucci why you have taken cases out of order, which you acknowledged as being important.  However, MEA is of the opinion that if a hearing officer or arbitrator cannot issue a timely decision, they should stop accepting cases until decisions have been issued out outstanding matters."  The Defendant demanded a full evidentiary hearing including Post Hearing Briefs, both demands disadvantaged me, a Pro Se complainant.  *See* Exhibit AD, attached and incorporated hereinafter (MEA letter to Burdick).

58.    On February 12, 2021, Hearing Officer Burdick ("Burdick"), rendered his "Award" on my Five (5) Day Suspension, eight months after the hearing and five months after Post Hearing Briefs were due.  Burdick dismissed one charge of insubordination included by Cukierman, but still

COMPLAINT
PAGE  24 of 52

upheld the Five (5) Day Suspension. Burdick's findings of facts were not supported by the evidence and his conclusions of law, not supported by the facts. Burdick's Award contained redacted information from a prior arbitration case (Mr. Lai, another City employee), a serious breach of confidentiality and gross negligence. My Award's cover page referenced "LEMU", the County of Riverside's Law Enforcement Management Unit, another case arbitrated by Mr. Burdick. Burdick lists Fuchs superior as Cukierman, yet Fuchs superior was Legg. Burdick was provided an 11x17 inch, Organization Chart, in the City's Exhibits, and the chart was discussed in detail at the hearing and memorialized in hearing transcripts. While these errors do not affect the merits of the case, this highlights Burdick's total disregard for the facts of the case and gross negligence. Burdick did not make one reference to the hearing transcripts in his "Award".

59.    On March 3, 2021, I interviewed with EEOC on my complaint filed on December 16, 2020, after receiving my 30-Day Suspension, Case number 550-2021-00362.

60.    On March 29, 2021, I filed a Writ of Administrative Mandamus to Petition the San Francisco Superior Court to vacate Burdick's "Award" as the evidence did not support Burdick's factual findings or conclusions of law. On August 5, 2021, the San Francisco Superior Court denied my request. On August 10, 2021, I filed an appeal with the 1st District Court of Appeal. On September 15, 2022, the 1st District Court of Appeal, affirmed the Superior Court's judgment. The Superior Court and Appellate Court erred and reviewed this case under the "substantial evidence" standard of review, contrary to well established court precedence set for independent review. I was unexperienced in these standards of review and had the naïve expectation that my case would be judged on its merits.

61.    During May and June of 2021, the Department hired a communications consultant to work with me for six sessions on my communication. The consultant suggested I check in with Fuchs to ask if he had any specific items, he would like me to work on with her. Fuchs' response: "That's a good question. Um, I don't know, I don't have anything specific." I clearly caught him off guard with the question. He responded he would think about it and get back to me. He responded two weeks later with (1) respect his authority and direction, (2) not accusing him of things in emails, and (3) accepting authority decisions, not constantly questioning, second guessing,

COMPLAINT
PAGE 25 of 52

1   seeking outside support.  Fuchs is unable to differentiate between having a valid reason to question a

2   procedure (i.e. - a violation of California statues related to recording), risk mitigation for the

3   organization, and process improvement versus his perception that I'm "challenging him".  My

4   questions to Fuchs involved compliance and procedures on the rules and regulations that govern our

5   business.  These inquiries protect and benefit the entire organization including Fuchs.

6       62.   In one coaching session, the consultant suggested I ask Fuchs questions in a more

7   inquisitive manner, and demonstrated this by using a higher, sweet pitch in her voice.  This was clear

8   gender bias, by instructing me to ask a man a question in a different manner based on my gender

9   (female).  This type of behavior reinforces gender stereotypes and perpetuates the idea that women

10  are not as confident or authoritative as men.  Her instruction undermined my ability to effectively

11  communicate and implied I should dumb myself down to placate Fuchs.

12      63.   On July 6, 2021, after the conclusion of the communication sessions with the

13  consultant, I emailed Nelly; the e-mail states in relevant part:  *"To quote, Indra Nooyi, CEO of*

14  *Pepsi, "Whatever anyone says or does, assume positive intent. You will be amazed. Your emotional*

15  *intelligence quotient goes up….you do not get defensive…you are trying to understand and*

16  *Listen…when you assume positive intent, the other person says, 'Hey wait a minute, maybe I'm*

17  *wrong reacting the way I do because this person is really making an effort"  I will work to assume*

18  *positive intent in my relationship with Management. I ask the Department to do the same, especially*

19  *during these critical months ahead, while I try to be successful without the one-on-one coaching. I*

20  *do hope Management will view progress in entirety and provide positive encouragement and timely*

21  *feedback as needed.  My sincere thanks to the Department for this opportunity.*  What followed was

22  increased scrutiny by Fuchs on alleged minor transgressions and aggressive, hostile, one-on-one

23  meetings with Fuchs.  Their communication sessions appeared to be a box to check off prior to

24  unlawful termination, as Fuchs never engaged in any further coaching on communication with me,

25  just further defamatory attacks on my communication.

26      64.   On July 19, 2021, I had a hearing on my Fifteen (15) Day Suspension with Arbitrator

27  Martin Gran ("Gran").  Gran had numerous conflicts of interest that were not disclosed to me.  Gran

28  was a prior City and County of San Francisco Human Resources Director and prior City and County

COMPLAINT
PAGE 26 of 52

of San Francisco City Attorney. Gran had a prior working relationship with the City Attorney assigned to represent the Department in this 15-Day Suspension case, Jonathan Yank, both previously worked at the same law firm. In addition, Gran was previous represented by Rafal Ofierski, the City Attorney who defended the City on my 5-Day Suspension hearing. A DHR Manager filed a discrimination case charging Gran of discrimination in San Francisco Superior Court. In addition, Gran had a prior working relationship with the Hearing Officer, Chris Burdick, who presided over my 5-Day Suspension hearing. Gran was not listed as a hearing officer in my CBA, another violation of my CBA and clearly had numerous conflicts of interest that were not disclosed to me. In addition, I was not allowed to speak on my behalf in the hearing, or invite witnesses, additional violations of due process. On November 24, 2021, Gran reduced the Suspension from 15-Days to 12-Days in his "Award", yet upheld that my "whistleblower" activities and discussing my fraudulent 5-Day Suspension with Cukierman was considered misconduct.

65. On September 9, 2021, I received a Determination Letter from DHR that there was insufficient evidence to support that Fuchs retaliated against me for my prior discrimination complaints. DHR EEO failed to reference my filed charges of retaliation and their temporal proximity to subsequent discipline and failed to investigate my 30-Day Suspension. I filed an Appeal to the Civil Service Commission, and a hearing was held on February 7, 2022 and the Commission upheld the DHR Director's decision. The Civil Service Commission is comprised mainly of prior City Human Resources employees and prior City Attorneys. I filed a Writ with the San Francisco Superior Court; the Court upheld the Commission's decision. The Court grants government agencies a presumption of correctness and the bar is very high for a Pro Per litigant to overcome and understand the nuisances of the various standards of review. The Court erred and reviewed this case under the "substantial evidence" standard of review, contrary to well established court precedence set for independent review.

66. On September 29, 2021, the Department notified me of new opened investigation and held an investigatory interview on October 7, 2021. Four emails were presented in the interview and one additional incident discussed. The Department interviewed two employees I supervise on the one incident, Emerson Santos ("Santos") and Nicolette Harper ("Harper"). Santos stated to ASR HR

COMPLAINT
PAGE 27 of 52

that Fuchs has a bias towards me. ASR HR never acknowledged Santos' charge and has never investigated any of my claims on discrimination or retaliation. As an example of their bias, ASR Human Resources failed to include this information in their investigatory notes. ASR Human Resources also attempts to magnify the gravity of my alleged insolence, stating: *"Rather than just acknowledge Fuchs' directive, you made a suggestion…"* My statement is innocuous at best, and it is indicative of the very strong bias against me, and that my opinion is neither valued nor wanted. Fuchs' documentation on this incident contradicts my write up on the incident as discussed in our one-on-one meeting. In addition, testimony from Santos and Harper does not corroborate Fuchs account of the incident. Both employees indicated their confusion to me on how such an innocent comment could elevate to an investigation by ASR Human Resources and shocked at its inclusion in a Notice of Dismissal. Fuchs provided his one-on-one meeting notes to ASR HR to support his charges. In the October 7, 2021, investigatory interview, I stated that I had one-on-one meeting notes on a couple of the incidents and could reference my notes, ASR HR responded in hast, "no, don't". ASR HR response in the interview highlights another unfair investigation and a predetermined decision to dismiss me from my position. I was only provided Fuchs notes when the Department issued their Notice of Proposed Dismissal on January 19, 2022. Fuchs notes were clearly written to support my alleged misconduct and did not contain other topics covered in the meetings as referenced in my notes on the same meetings. This further supports the Department's discipline is retaliatory and not substantiated with evidence. The Department again charged me with (1) Inappropriate Communication, (2) Unprofessional Conduct, and (3) Failure to Follow Directives. In addition, the Department included (4) Violation of Assessor-Recorder's Standards of Conduct Policy and (5) Violation of the City and County of San Francisco's Respect Policy, yet the Department did not list an offense here, but simply states *"Based on the findings of the investigative report, you continue to demonstrate a lack of willingness or ability to communicate and behave appropriately and professionally, and as such violates the City's Respect Policy."* Their adverse employment actions are arbitrary and capricious. My communication shows a clear concern for the public we serve and our staff and I am disciplined for this same communication, clearly a retaliatory animus and not "*Just Cause*" for termination.

COMPLAINT
PAGE  28 of 52

67.    I have been through the City's *Skelly* Hearing process on four occasions now.  Not at any time did a DHR *Skelly* Officer dispute any charge by the Department.  Their shame *Skelly* hearings are a rubber stamp of the Department's charges, despite any evidence to the contrary, or consideration of normal discourse in the work environment.  Two women *Skelly* Officers (DHR manager and DHR Director) have responded to my claims of intimidation and bullying by my Manager:  one responded that I was not persuasive because according to the DHR *Skelly* Officer, "Tunucci directly challenges her Manager's decision making and blatantly disregard his directives" and another DHR *Skelly* Officer responded to my comment of being intimidated by my Manager by stating "this is not demonstrated by the email communications between Tunucci and Fuchs when she on multiple occasions corrects and challenges Fuchs' directions."  The last woman *Skelly* Officer who conducted my termination *Skelly* hearing failed to address my gender bias and discrimination charge as it was predetermined that I would be terminated and she upheld that termination decision.  Their dismissal of my gender discrimination and intimidation charge was victim blaming, set up to favor hierarchical management, and displays systemic implicit gender bias institutionalized by a history of patriarchal government structure.  I provided notes on my August 11, 2021, one-on-one meeting with Fuchs, to this *Skelly* Officer, where Fuchs mocks one of my e-mails, in part:  "I stated to Fuchs that he reads the tone into the e-mail.  That I didn't intend any tone. . . Fuchs then stated, "*you put all your craziness into it*"."  Then he mocked in a sarcastic, dark comic, mimic of what he intended to be my voice expressing his perceived meaning and emotional tone of the e-mail statement: "*OMG we deserve better, why aren't they doing anything.*"  Fuchs interpretation of my e-mail came from a closing statement I made, "We deserve better".  He categorized this statement in my email as me yelling.  Then Fuchs again mentioned the tone of my e-mail and stated "*it's there, you know it's an issue, we've discussed this before*".  Fuchs mocking was perceived by me as sexist, malicious and vicious.  I have made various gender bias claims regarding Fuchs to ASR Human Resources and DHR EEO, *Skelly* Officers, and all failed to investigate.  There is an inherent gender bias that a woman manager questioning or clarifying procedures with a male manager is misconduct, resulting in suspensions and termination.  Gender equality includes challenging societal norms and

COMPLAINT
PAGE  29 of 52

stereotypes that limit individuals based on their gender. *See* Exhibit AE, attached and incorporated hereinafter (My one-on-one meeting with Fuchs notes from August 11, 2021).

68.   I did not receive a performance review by Fuchs in the 4 years that I reported to him and worked in ASR. I did not receive coaching, training or any assistance considered positive employee development by Fuchs. My bonuses through my union were reallocated on 3 years without communication to me. Not once, did anyone in ASR Management or ASR HR have a conversation with me on why my bonus was denied and reallocated. I had positive working relationships with all staff that reported to me and those I provided service to; financial institutions, title companies, lawyers, other City Departments and the public. I, through the supervision of my staff, met and surpassed all Department goals and standards and eliminated all backlogs present when I was hired. Six employees provided me character references for my termination *Skelly* hearing that contradicted the Department's negative assessment of my character and communication. *See* Exhibit AF, attached and incorporated hereinafter (Recorder Division Staff – Tunucci character references). After every suspension, despite suffering psychological trauma, I strived to work harder, excel and be recognized for my contributions, without success. I arrived to the office before staff and left after staff, provided excellent service to the Public and maintained all processing and service standards. ASR rarely acknowledged my contributions to the Department, nor my contributions during the initial challenging months of Covid-19 when I was the only Management employee on site during the first several months of Covid-19 Shelter in Place, supervising a critical function. Nor did they ever recognize my excellent service to the Public. I never received one complaint from the Public, just the opposite, commending me on my service.

69.   On January 18, 2022, my access to my work computer was suspended the day prior to my scheduled vacation. Nelly attempted to send a secure message to my home email address on January 18, 2022, titled Notice of Proposed Disciplinary Action and a Notice of Paid Administrative Leave. I and my union rep, Criss Romero, were unable to open. The mailed *Skelly* package was received by me on January 26, 2022, while I was still on vacation. The *Skelly* Hearing was held on February 15, 2022 and I was dismissed from my position on March 18, 2022.

COMPLAINT
PAGE  30 of 52

70.    To date, my Arbitration Hearings on my Thirty (30) Day Suspension and Dismissal are outstanding without a status by the Department of Human Resources, despite weekly follow up by my union. The City has engaged in a continued pattern of dragging out investigations to keep me under a cloud of uncertainty. Their prolonged and unjustified investigations created a hostile work environment, causing me to feel stressed, anxious, and continually uncertain about my job and financial security. On October 17, 2022, Criss Romero, Municipal Executive Association, Senior Labor Relations Representative, responded to me with an update, "I have been working with ERD [City and County of San Francisco Employee Relations Department] to straighten out the 5 outstanding grievances related to your case." The City continues to run out the clock; two years have transpired since my 30-Day Suspension was imposed and more than two years since the union filed the procedural violation grievances. Criss Romero reported he contacts DHR several times a week and there has been no update to date. I continued to followed up with Mr. Romero on October 28, 2022, November 8, 2022, November 16, 2022, November 18, 2022, December 5, 2022, December 7, 2022, January 9, 2023 and January 23, 2023 and on most occasions receive no response. Mr. Romero responded on January 26, 2023 without any further progress on the outstanding grievances. The City continues to violate my liberty and property interests, rights to due process under the 14th Amendment. The 14th Amendment prohibits the government from depriving individuals of property without due process. The Due Process Clause describes the legal obligation of all government entities to use fair procedures and act within the law and quoting "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The right to employment is a property interest. *See* Exhibit AG, attached and incorporated hereinafter (email communication with MEA union representative, Criss Romero after termination).

71.    Included in Exhibit AH, attached and incorporated hereinafter, a timeline for protected activities I engaged in and the resulting adverse employment actions.

72.    The Equal Employment Opportunity Commission issued Notice-of-Right-to-Sue letters which were received by me on or about October 31, 2022. The California Department of Fair Employment and Housing issued a Notice-of-Right to Sue letter which was received by me on or

COMPLAINT
PAGE 31 of 52

1   about May 20, 2022.  I have attached the letters to this Notice of Complaint.  This Notice of

2   Complaint is filed timely, on January 30, 2023, within the official EEOC's notice and their stated

3   time limit of filing a lawsuit within ninety-days of my receipt of their notice.  *See* Exhibit A,

4   attached and incorporated hereinafter.

5

6                                **First Claim for Relief**

7              **(Retaliation – Wrongful Termination/Retaliation)**

8          This claim is brought under the provisions of Title VII of the Civil Rights Act of 1964, 42

9   U.S.C. §§ 2000e, *et. seq*., and at all times applicable to this case, was in full force and effect and

10  binding on Defendant and prohibited Defendant from retaliating against me, who engaged in

11  protected activities, a Charge of Discrimination and Retaliation.

12         To prove a Title VII retaliation claim, the law in *Ray v Henderson*, 217 F3d 1234 states "To

13  succeed in a retaliation claim, the plaintiff must demonstrate (1) that she was engaging in protected

14  activity, (2) that she suffered an adverse employment decision, and (3) that there was a causal link

15  between her activity and the employment decision" citing  *Folkerson v. Circus Circus Enterprises,*

16  *Inc.*, 107 F.3d 754, 755 (9th Cir.1977).

17         To prove a complaint of retaliation in violation of the Defendant's EEO Policy: (1)

18  complainant engaged in in a protected activity, (2) complainant suffered an adverse employment

19  action, and (3) there was a causal link between the protected activity and the adverse employment

20  action.

21         I engaged in a protected activity of October 5, 2018, October 9, 2018, October 15, 2018 and

22  October 18, 2018, when I reported what I believed was discriminatory conduct by Fuchs.  On

23  October 26, 2018, I suffered an adverse employment action, a verbal warning, documented by Fuchs

24  on October 30, 2018, citing emails and incidents where I was describing what I believed was

25  disparate, discriminatory behavior by Fuchs and Ah'Nin, the causal link between the protected

26  activity and the adverse employment action discussion, as more fully described above in the

27  Statement of Facts.  The law states filing a complaint with the EEOC is a protected activity. *See* 42

28  U.S.C. § 2000e-3(a). Making an informal complaint to a supervisor is also a protected activity. *See*

COMPLAINT
PAGE  32 of 52

1 | *Equal Employment Opportunity Commission v. Hacienda Hotel*, 881 F.2d 1504, 1514 (9th Cir.

2 | 1989).

3 | Title VII prohibits employers from discriminating against an employee because that

4 | employee "has opposed any practice made an unlawful employment practice by this sub-chapter, or

5 | because he has made a charge, testified, assisted, or participated in any manner in an investigation,

6 | proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). An employee's complaints

7 | about the treatment of others is considered a protected activity, even if the employee is not a member

8 | of the class that he claims suffered from discrimination, and even if the discrimination he

9 | complained about was not legally cognizable. *See Moyo v. Gomez*, 40 F.3d 982 (9th Cir. 1994)

10 | (prison guard had a claim for retaliation if he was discharged for complaining about the treatment of

11 | black inmates and he was acting on a reasonable belief that a Title VII violation had occurred, even

12 | though the complained-of discrimination was not actually a Title VII violation).  The EEOC has

13 | interpreted "adverse employment action" to mean "any adverse treatment that is based on a

14 | retaliatory motive and is reasonably likely to deter the charging party or others from engaging in

15 | protected activity." EEOC Compliance Manual Section 8, "Retaliation," P 8008 (1998). Although

16 | EEOC Guidelines are not binding on the courts, they "constitute a body of experience and informed

17 | judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank v.*

18 | *Vinson*, 477 U.S. 57, 65 (1986) (quoting *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944)); see also

19 | *Gutierrez v. Municipal Court*, 838 F.2d 1031, 1049 (9th Cir. 1988).

20 | I engaged in a protected activity on October 29, 2018 and made a complaint of retaliation to

21 | ASR HR.  On November 3, 2018, I filed a complaint with EEOC, regarding discriminatory behavior

22 | and retaliation.  On November 30, 2018, I suffered an adverse employment action, a written

23 | warning, handed to me by Fuchs without investigation or discussion as more fully described above

24 | in the Statement of Facts.

25 | I engaged in a protected activity on June 4, 2019 and made a complaint of retaliation to DHR

26 | EEO.  ASR was notified of the complaint on June 6, 2019 and on June 14, 2019.  I suffered an

27 | adverse employment action, a Notice of Proposed Five (5) Day Suspension (*Skelly* Notice) that

28 | alleged insubordination and unprofessional conduct without investigation or discussion as more fully

COMPLAINT
PAGE  33 of 52

described above in the Statement of Facts.  The law states the causal connection of an employer's actions and the employee's engagement in protected activities may be inferred from "proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas,* 809 F.3d at 1371.

I engaged in a protected activity on September 9, 2019 and made an amended complaint of retaliation to DHR EEO.  ASR was notified of the complaint on September 13, 2019.  I suffered several adverse employment actions: two investigatory interviews, and a Notice of Proposed Fifteen (15) Day Suspension (*Skelly* Notice) that included discipline for incidents that are protected activity under City and Department Whistleblower and Supervisory procedures as more fully described above in the Statement of Facts.

I engaged in a protected activity on March 23, 2020 and signed and updated an official Charge of Discrimination with EEOC and a claim of continued retaliation by ASR, Case 550-2020-00715.  The Defendant was notified on April 7, 2020.  On April 7, 2020, Nelly was interviewed by DHR EEO on my Charge of Discrimination/Retaliation, a protected activity.  I engaged in a protected activity on May 4, 2020 and scheduled an arbitration hearing on my 5-Day Suspension and the Defendant was notified on May 4, 2020.  On May 15, 2020, I suffered an adverse employment action, a notice for a new Investigatory interview held on May 29, 2020.  The incidents in this interview became the Notice of Proposed Thirty (30) Day Suspension (*Skelly* Notice) issued to me on August 21, 2020 as more fully described above in the Statement of Facts.  The law states "Opposition" to discrimination can take the form of "*informal protests of discriminatory employment practices, including making complaints to management*." <u>Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,</u> 450 F.3d 130, 135 (3d Cir.2006). "*we look to the message being conveyed rather than the means of conveyance.*" *Id.* 42 U.S.C. § 2000e-3(a) making it unlawful to discriminate "*there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries.... Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute.[¶] It is therefore appropriate that we consider Petitioner's allegations collectively.*" In *Robinston v. Southeastern Pennsylvania Transp. Authority* (1993) 982 F.2d 892, 895, the court

COMPLAINT
PAGE  34 of 52

found following a grievance, the trial judge determined that the supervisors began a pattern of harassing by repeatedly disciplining minor matters and supported a finding of a causal link.

I engaged in a protected activity on August 10, 2021 and filed an Appeal on my 5-Day Suspension Award with 1st District Court of Appeal.  Defendant was notified of my Appeal on August 10, 2021 and on August 18, 2021.  On August 25, 2021, the Defendant began a pattern of collecting incidents to support dismissal from my position.  I suffered the following adverse employment actions:  (1) an Investigatory Interview on October 7, 2021, (2) Notice of Proposed Dismissal on January 19, 2022 and (3) Termination on March 18, 2022, as more fully described above in the Statement of Facts.

The Department's prolonged investigations and adverse employment actions over my four years of employment without "*Just Cause*" after I made complaints or raised concerns are continued retaliation.

I have suffered and continue to suffer economic damages, including lost wages and benefits and other compensatory damages, damage to my professional reputation and professional standing, legal and court expenses, future earnings and benefits, humiliation, embarrassment with co-workers, friends, members of the community and family, and anguish.  As a further result of the acts of Defendant as alleged above, I have suffered mental, emotional, and physical distress, have been damaged, and I continue to suffer emotional distress.

The conduct of Defendant and their employees as described herein was malicious and oppressive and done with a willful and conscious disregard for my rights.  Consequently, I am entitled to punitive damages.

## Second Claim for Relief

### (1st Amendment – Freedom of Speech Violations)

This claim is brought under the First Amendment of the United States Constitution, which guarantees freedom of speech and prohibits the government from infringing on that right.  The Supreme Court has recognized that the government, as an employer, has a legitimate interest in regulating the speech of its employees in order to ensure efficient and effective operation of the

1    workplace.  Title VII and Whistleblower laws (California Labor Code §1102.5) are protected under

2    1st Amendment rights.

3        To prove a First Amendment speech rights violation claim, a plaintiff must demonstrate that

4    (1) their speech was protected by the First Amendment, (2) their speech was a substantial or

5    motivating factor in the defendant's adverse employment actions, a causal connection between their

6    speech and the defendant's action, (3) the defendant must be a government entity, (4) the plaintiff

7    suffered an adverse employment action, and (5) the government's actions were not based on a

8    compelling governmental interest.

9        I engaged in a protected speech in an e-mail chain from October 16th to October 24th, 2018,

10   when I reported what I believed was discriminatory conduct by Fuchs.  On October 26, 2018, I

11   suffered an adverse employment action, a verbal warning, documented by Fuchs on October 30,

12   2018, citing emails and incidents where I was describing what I believed was disparate,

13   discriminatory behavior by Fuchs and Ah'Nin, the causal link between the protected activity and the

14   adverse employment action.  The law states filing a complaint with the EEOC is a protected activity.

15   *See* 42 U.S.C. § 2000e-3(a). Making an informal complaint to a supervisor is also a protected

16   activity. *See Equal Employment Opportunity Commission v. Hacienda Hotel*, 881 F.2d 1504, 1514

17   (9th Cir. 1989).

18       I engaged in protected speech in a conversation with ASR Human Resources Analyst James

19   Galileo on October 10, 2018 and complained about the work environment in the office.  On October

20   26, 2018 I suffered an adverse employment action, a verbal warning, documented by Fuchs on

21   October 30, 2018, citing this incident.

22       I engaged in protected speech in a conversation with ASR Public Service Manager, Derek

23   Ah'Nin on October 24, 2018 and complained about what I felt was discriminatory behavior.  On

24   October 26, 2018 I suffered an adverse employment action, a verbal warning, documented by Fuchs

25   on October 30, 2018, citing this incident.

26       The Supreme Court has consistently recognized public employees' rights under the First

27   Amendment.  *See City of San Diego v. Roe*, ("[A] government employee does not relinquish all First

28   Amendment rights otherwise enjoyed by citizens just by reason of his or her employment."); *see also*

COMPLAINT
PAGE  36 of 52

*Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.") Freedom of expression is a fundamental right.

On June 25, 2019, Legg gave me a directive: "You are instructed not to send emails when you don't agree with decisions being made by your manager or other staff members regarding processes or projects." This was in response to an email where I notified Legg of a violation of California Recorder Government Codes. This is in direct violation of Whistleblower laws. The point of Whistleblower laws is to encourage the reporting of unethical or illegal behavior, support integrity and honesty in the workplace, promote transparency and accountability and help to prevent fraud and misconduct. These laws protect both the organization by helping to identify and address internal issues and supports compliance with laws and regulations. These laws also protect employees by preventing retaliation from the employer, provides legal remedies for retaliation, protects job security, encourages reporting of unethical or illegal behavior and supports the employee's right to free speech and lawful reporting. Whistleblowing is a form of free speech because it allows employees to express their concerns about potential unethical or illegal behavior. The First Amendment protects the right to free speech, including speech related to matters of public concern. The First Amendment's protection of free speech protects whistleblowers from retaliation for speaking out.

ASR Administrative Policies and Procedures, under *Section 2.2 Whistleblowing* "*If an employee is concerned about improper activity or conduct occurring in the Department, the employee should raise these concerns through one of the City entities that are equipped to thoroughly and confidentially investigate such concerns, including but not limited to the Controller's Office, Ethics Commission, District Attorney, or City Attorney*", and under *Section 2.4 Retaliation* "*. . .prohibit retaliation in any form against any employee for opposing discriminatory practices, for filing a complaint with, or otherwise participating in an investigation, proceeding, or hearing conducted by the Equal Employment Opportunity Commission or Department of Fair Employment and Housing. Additionally, the Department does not tolerate retaliation against anyone who, in*

COMPLAINT
PAGE 37 of 52

1  *good faith, reported a concern in accordance with the City Whistleblower Program (see Section 2.2*

2  *above) or participates in an investigation conducted by a City agency or the Department, even if the*

3  *allegation ultimately is not substantiated . . . ".*  Per City & ASR Policies and Procedures, the City

4  Attorney is a proper chain of escalation for improper activity and retaliation is prohibited.

5        ASR mounted a retaliatory campaign against me when I followed City and ASR escalation

6  procedures and alerted the City Attorney of Fuchs illegal procedure in violation of California

7  Probate Code and inappropriate management conduct.  I was suspended in retaliation for my lawful

8  exercise of rights provided under Labor Code §11025 including, but not limited to, giving

9  instructions to record a Deed authorized by the City and County of San Francisco Board of

10  Supervisors and Mayor London Breed (included in 5-Day Suspension), notifications of unlawful

11  business practices to the City Attorney (included in 15-Day Suspension), and by opposing and

12  protesting disciplinary actions taken against me including my termination.  Immediately following

13  my EEO Complaints, and other issues I raised to the attention of the Defendant, the Department

14  engaged in the disciplinary process, and creates a chilling effect on my right to raise these issues.

15  This was further exacerbated by the Defendant's directive prohibiting me from contacting the City

16  Attorney, which violates my right to file a whistleblower complaint.  Whistleblower laws protect

17  employees who report or disclose illegal or unethical conduct in the workplace. If an employee is

18  blocked from documenting hostile behavior in an email, it could be considered retaliation for

19  speaking out against illegal or unethical conduct.

20        Additionally, the First Amendment of the U.S. Constitution guarantees the right to free

21  speech. While this right is not absolute, the Defendant violated my right to free speech by taking

22  action against me for expressing my opinions in the workplace, such as documenting my Manager's

23  hostile behavior in an email.  Employers have the right to set policies and guidelines for

24  communication and use of company's resources. However, the Department's policies and adverse

25  employment actions to restrict my ability to report or disclose illegal or unethical conduct, restrict

26  my freedom of speech, and violates whistleblower laws and/or the First Amendment.

27       In the case of *Public Citizen v. Department of Justice*, 491 U.S. 440 (1989).  The Supreme

28  Court held that the First Amendment protects government employees who blow the whistle on

COMPLAINT
PAGE  38 of 52

1    government misconduct.  Defendant has subjected me to adverse employment actions in retaliation

2    for my complaints as more fully described above in the Statement of Facts.

3        I have suffered and continue to suffer economic damages, including lost wages and benefits

4    and other compensatory damages, damage to my professional reputation, legal and court expenses,

5    future earnings and benefits, humiliation, embarrassment with co-workers, friends, members of the

6    community and family, and anguish.  As a further result of the acts of Defendant as alleged above, I

7    have suffered mental, emotional, and physical distress, have been damaged, and I continue to suffer

8    emotional distress.

9        The conduct of Defendant and their employees as described herein was malicious and

10   oppressive and done with a willful and conscious disregard for my rights.  Consequently, I am

11   entitled to punitive damages.

**Third Claim for Relief**

**(Wrongful Termination in Violation/Breach of Employment Contract)**

14       This claim is brought under violation and breach of my collective bargaining agreement

15   ("CBA"), Memorandum of Understanding Between the City and County of San Francisco and the

16   Municipal Executives Association ("MEA").

17       To prove a breach of employment contract, a plaintiff must demonstrate: (1) there was a valid

18   employment contract in place, (2) the defendant breached the contract in some way, and (3) the

19   plaintiff suffered damages as a result.

20       The Defendant violated and failed to follow the negotiated terms of my CBA, the contractual

21   terms between the Defendant and my union, Municipal Executives Association ("MEA"), I have a

22   right to expect:  On October 26, 2018, ASR issued me a verbal warning, documented in an email on

23   October 30, 2018.  On November 30, 2018, ASR issued me a written warning.  On June 14, 2019,

24   ASR issued me a Notice of Proposed Five (5) Day Suspension.  ASR did not conduct an

25   investigation prior to issuing my verbal warning, written warning and Notice of Proposed Five (5)

26   Day Suspension, in violation of MEA CBA, Section II C Discipline *104. No action to impose*

27   *discipline against an employee shall be imitated more than thirty (30) days from the date the City*

28   *knew of the conduct and has completed a diligent and timely investigation, except for conduct which*

COMPLAINT
PAGE  39 of 52

1    *would constitute the commission of a crime. The discipline imposed make take into account conduct*

2    *that is documented in the employee's personnel file or was the subject of a prior unsealed*

3    *disciplinary action.* ASR imposed an adverse employment action, a Five (5) Day Suspension

4    without pay.

5         On August 21, 2020, ASR issued me a Notice of Proposed Thirty (30) Day Suspension. On

6    January 18, 2022, ASR issued me a Notice of Proposed Dismissal from Employment. ASR

7    conducted an investigation for each of these adverse employment actions, but did not complete a

8    timely investigation, and imposed discipline more than thirty (30) days from the date the City knew

9    of the conduct in violation of MEA CBA, Section II C Discipline *104. No action to impose*

10   *discipline against an employee shall be imated more than thirty (30) days from the date the City*

11   *knew of the conduct and has completed a diligent and timely investigation, except for conduct which*

12   *would constitute the commission of a crime. The discipline imposed make take into account conduct*

13   *that is documented in the employee's personnel file or was the subject of a prior unsealed*

14   *disciplinary action.* ASR imposed severe adverse employment actions; a 30-Day Suspension

15   without pay and terminated my employment with the Defendant.

16        The Department's prolonged investigations and adverse employment actions over my four

17   years of employment without "*Just Cause*" after I made complaints or raised concerns are continued

18   violation of my CBA. I continually felt the impact of their investigation on my work and well-being.

19        The Defendant violated and failed to follow the negotiated terms of my CBA, the contractual

20   terms between the Defendant and my union, Municipal Executives Association ("MEA"), I have a

21   right to expect. ASR did not conduct fair investigations or equal treatment in their adverse

22   employment actions in violation of MEA CBA, Section II. C. Discipline *81. All discipline shall be*

23   *for just cause.* The "*Just Cause*" Standard has a well-established meaning in labor relations and

24   employment law as stated by Koven & Smith, in *Just Cause: The Seven Tests* (1998) The "Seven

25   Tests" are: (1) Notice – did the employer provide notice of possible or probable consequence of

26   employee's discipline?, (2) Reasonable Rule or Order – was the Employer's rule or managerial order

27   reasonable related to the orderly, efficient and safe operation of the Employer's business and the

28   performance that the Employer might properly expect of the employee?, (3) Investigation – did the

COMPLAINT
PAGE 40 of 52

Employer, before administering the discipline, conduct an investigation,  (4) Fair Investigation – was the Employer's investigation conducted fairly and objectively?, (5) Proof – did the investigation, obtain substantial evidence or proof that the employee was guilty as charged?, (6) Equal Treatment – has the Employer applied its rules, orders and penalties even-handedly and without discrimination to all employees?, and (7) Penalty – was the degree of discipline administered by the Employer in a particular case reasonable related to the seriousness of the employee's proven offense, and the record of the employee in his service with the Employer?.

The Defendant violated the *Just Cause* elements in administering their adverse employment actions in every adverse employment action I sustained:  (1) verbal warning, (2) written warning, (3) 5-DaySuspension, (4) 15-Day Suspension, (5) 30-Day Suspension and (6) Dismissal/Termination. The Defendant denied my liberty and property interests, rights to due process under the 14th Amendment, as well as protections against being subjected to charges on the basis of false evidence that were deliberately fabricated and pretextual to support the Department's illegal retaliation charges.

Under *Airgas USA, LLC, v. National Labor Relations Board*, (2019) 916 F.3d 555, 560, 563 "Another indicium of inconsistency is "failure to conduct a meaningful investigation" "[A]bsence of a meaningful investigation into allegedly impermissible conduct before imposing discipline is an accepted form of circumstantial evidence of. . .animus."  Disparate treatment, "[D]isparate treatment of certain employees compared to other employees with similar work records or offenses" may support a finding of . . .animus."  "Viewing that evidence alongside the temporal proximity to protected activity and the conclusions regarding . . .poor credibility. . .a reasonable mind could conclude that . . . chose to issue a written warning. . .because of his charge-filing activity."

MEA violated and failed to follow the negotiated terms of my CBA, the contractual terms between the Defendant and my union, Municipal Executives Association ("MEA"), I have a right to expect.  On September 25, 2019, Criss Romero, MEA Senior Labor Relations Representative declined to represent me in my 5-Day Suspension hearing in violation of MEA CBA, Section I.A. Recognition ". . . .*the Association has been certified by the Civil Service Commission as the recognized employee representative"* and in violation of an employee's right to representation under

1    PERB.  I was harmed as I was unable to adequately represent myself in a full evidentiary hearing

2    and inexperienced in completing a Post Hearing brief.  As a result, I was not able to adequately

3    refute the Defendant's falsified, fraudulent charges and the Arbitrator (Hearing Officer) upheld the

4    5-Day Suspension without pay.

5            The Defendant and MEA violated and failed to follow the negotiated terms of my CBA, the

6    contractual terms between the Defendant and my union, Municipal Executives Association

7    ("MEA"), I have a right to expect.  On May 20, 2021, Criss Romero, MEA Senior Labor Relations

8    Representative, notified me a date for my Fifteen (15) Day Suspension arbitration was set for

9    Monday, July 19, 2021 with City Attorney, Jonathan Yank representing the City and Arbitrator

10   Martin Gran. Per my CBA:  *89. Eligible, represented employees may appeal disciplinary*

11   *suspensions, demotions and terminations to a hearing officer selected from Appendix B. The hearing*

12   *officer shall be mutually selected pursuant to the striking procedure set forth in Article I.H.4.*

13   Gran's name was added to Appendix B, only to arbitrate over my case, and prevented me from a fair

14   hearing due to his numerous conflicts of interest as more fully described above in the Statement of

15   Facts. There were six other eligible hearing officers on Appendix B at the time of my hearing.  I was

16   harmed as I did not receive a fair trial and Gran reduced the 15-Day Suspension to a 12-Day

17   Suspension without pay, a significant, severe adverse employment action.

18           To date, the Defendant has continued to obstruct due process in violation of the negotiated

19   terms of my CBA, the contractual terms between the Defendant and my union, Municipal Executives

20   Association ("MEA"), I have a right to expect.  The Defendant has denied my liberty and property

21   interests, rights to due process under the 14th Amendment and in violation of MEA CBA, Section II.

22   C. Discipline *89. Eligible, represented employees may appeal disciplinary suspensions, demotions*

23   *and terminations to a hearing officer selected from Appendix B. The hearing officer shall be*

24   *mutually selected pursuant to the striking procedure set forth in Article I.H.4.*  I have not received a

25   third-party neutral arbitration on my 30-Day Suspension, nor on my dismissal/termination from

26   employment. The 14th Amendment prohibits the government from depriving individuals of property

27   without due process. In the case of *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972),

28   the Supreme Court held that a right to employment is a property interest protected by the Due

COMPLAINT
PAGE  42 of 52

Process Clause of the 14th Amendment.  The Due Process Clause describes the legal obligation of all government entities to use fair procedures and act within the law and quoting "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

I have suffered and continue to suffer economic damages, including lost wages and benefits and other compensatory damages, damage to my professional reputation, legal and court expenses, future earnings and benefits, humiliation, embarrassment with co-workers, friends, members of the community and family, and anguish.  As a further result of the acts of Defendant as alleged above, I have suffered mental, emotional, and physical distress, have been damaged, and I continue to suffer emotional distress.

### Fourth Claim for Relief

### (Discrimination – Gender (Sex))

This claim is brought under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq.*, and at all times applicable to this case, was in full force and effect and binding on Defendant and prohibited Defendant from discriminating against me, on the basis of a protected class (female).

To prove a claim of discrimination and disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq*, a plaintiff must show "(1) she is a member of a protected class; [female] (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 656 (9th Cir. 2006). Other employees are similarly situated to the plaintiff when they have similar jobs and display similar conduct." *Id.* (quoting *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011)."

To prove a gender inequality, claim in court under Title VII of the Civil Rights Act of 1964, the plaintiff (the person making the claim) must demonstrate that they were treated differently than other employees of the opposite sex in the same or similar circumstances, and that this treatment was based on their sex.  In addition, Title VII prohibits discrimination on the basis of sex, which includes

COMPLAINT
PAGE  43 of 52

discrimination against individuals because they do not conform to gender stereotypes. The plaintiff must also show that this discrimination had a negative impact on their employment, such as not being hired, being fired, or being passed over for promotions. Additionally, the plaintiff must be able to prove that their employer knew or should have known about the discrimination and failed to take appropriate action to stop it. Examples include being subjected to different work conditions or expectations than employees of the opposite sex, being denied training or development opportunities given to employees of the opposite sex, being subject to different disciplinary action than employees of the opposite sex who engage in similar conduct.

To prove implicit gender bias, in the workplace, a plaintiff must show (1) documentation of unequal treatment, (2) evidence of gender-based comments or attitudes, (3) comparison of treatment to similarly situated individuals, and (4) circumstantial evidence such as patterns of behavior and decision making.

The court recognizes that not all discrimination is overt, and that even small differences in treatment can be used as evidence of discrimination. A female employee being fired for a mistake, while a male employee who made the same mistake is given a warning. A male employee receiving a more lenient punishment for violating company policies than a female employee who engaged in similar conduct. A female employee being denied the chance to explain their behavior before disciplinary action was taken while a male employee was given that opportunity. This raises an inference of discrimination and disparate treatment of a female employee illegal under Title VII of the Civil Rights Act of 1964.

*Harris v. Forklift Systems, Inc.* (1993) established that a plaintiff could prove discrimination based on a theory of hostile work environment, rather than just proving discriminatory intent. The court also established that an employer can be held liable for the discriminatory conduct of its supervisors. In *Price Waterhouse v. Hopkins* , 490 U.S. 228 (1989), the Supreme Court established that an employer's failure to promote an employee because of stereotypical assumptions about how a woman should behave is a form of sex discrimination. This case found Discrimination against an employee on the basis of sex stereotyping—that is, a person's nonconformity to social or other expectations of that person's gender—constitutes impermissible sex discrimination, in violation of

COMPLAINT
PAGE 44 of 52

Title VII of the Civil Rights Act of 1964.  The employer bears the burden of proving that adverse employment action would have been the same if sex discrimination had not occurred.

In my case, the existence of a grievance procedure in the City and the City's policy against discrimination, coupled with Defendant's failure to invoke that procedure, allowed a discriminatory motive to play a part in an adverse employment decision, and therefore must prove by clear and convincing evidence that it would have made the same decision in the absence of discrimination.

The Defendant unlawfully discriminated against me on the basis of sex by consciously giving credence and effect to Fuchs' comments about me that resulted from sex stereotyping.   In this case "The words "because of" in § 703(a)(1) of the Act, which forbids an employer to make an adverse decision against an employee "because of such individual's. . . sex," requires looking al all of the reasons, both legitimate and illegitimate, contribution to the decision at the time it is made.  The Defendant cannot merely show that my alleged "interpersonal problems" constituted a legitimate reason for discipline, Defendant must show its legitimate reason, standing alone, would have warranted the discipline.

The employer's actions had a disparate impact on a protected class (women) and the employer's practices disproportionately affected my gender (woman) over the other (man) and I suffered discriminatory animus as a result.  Fuchs illegal activities of aggression, assault and potential substance abuse were not investigated.  Yet, I was constantly judged, investigated and disciplined for "tone" in my emails, despite communicating valid business issues.  The inherent bias in the Department expected a different standard for women, to be "nice" and "more accommodating" than men.

The Department exhibited entrenched biases that value confidence and aggressiveness in men while penalizing me when I exhibited similar traits.  My work was sabotaged; process and service enhancement requests blocked or ignored.   Male managers made accusations and their accusations were deemed credible without investigation or evidence.  I made accusations and suffered adverse employment actions and was deemed not credible.  I was harshly criticized and disciplined for the same behavior that my male colleagues engaged in without reprise.  My male

COMPLAINT
PAGE  45 of 52

colleagues engaged in behavior that was illegal without reprise. There was a "fix the woman" (me) mentality in the Department, rather than eliminate gender stereotypes in the Department.

On December 4, 2018, I made a complaint on the basis of gender/sex (woman) to Jonathan Nelly, ASR Human Resources Manager. On October 24, 2019, in an email to Nelly and Buss I made a claim of discrimination. On November 5, 2019, I participated in the Investigatory interview and reported gender discrimination to both Jonathan Nelly, ASR Human Resources Manager and Gerald Buss, ASR Human Resources Senior Analyst. On May 20, 2020, I emailed Nelly and complained of continued harassment, retaliation and bullying by ASR. In addition, I complained about gender discrimination in this email "*This Department views women in gender stereotypes and judges them in that light. . . .*" I notified Nelly of the severe psychological effect these investigations were having on my mental health. I reported disparate treatment and the different standards applied to Fuchs and other male employees as more fully described above in the Statement of Facts. I reported the discriminatory, disparate behavior to DHR EEO, DHR *Skelly* Officers and EEOC.

The Defendant failed to implement fair and transparent policies and procedures for discipline, and to provide training to managers on how to recognize and address potential bias in the discipline process. Their inherent gender stereotypes included how they perceived and evaluated my communication. I was viewed as less competent and less authoritative than my male colleagues. And when I did speak assertively or in a commanding tone, I was perceived as "inappropriate", "disruptive", rather than confident or competent.

I have suffered and continue to suffer economic damages, including lost wages and benefits and other compensatory damages, damage to my professional reputation, legal and court expenses, future earnings and benefits, humiliation, embarrassment with co-workers, friends, members of the community and family, and anguish. As a further result of the acts of Defendant as alleged above, I have suffered mental, emotional, and physical distress, have been damaged, and I continue to suffer emotional distress.

The conduct of Defendant as alleged above was a substantial factor in causing my harm, as described above. The conduct of Defendant and their employees as described herein was malicious

COMPLAINT
PAGE  46 of 52

1  and oppressive and done with a willful and conscious disregard for my rights.  Consequently, I am

2  entitled to punitive damages.

3                              **Fifth Claim for Relief**

4            **(Failure to Prevent Retaliation Harassment/Hostile Work Environment)**

5            This claim is brought under the provisions of Title VII of the Civil Rights Act of 1964, 42

6  U.S.C. §§ 2000e, *et. seq.*, and at all times applicable to this case, was in full force and effect and

7  binding on Defendant and prohibited Defendant from discriminating against me, on the basis of a

8  protected class (female) and retaliation for opposition to protected activities.  At all relevant time

9  periods there existed within the organization of ASR a pattern and practice of conduct by its

10  personnel that resulted in harassment directed at, but not limited to me.  The Defendant failed to take

11  reasonable steps of conducting a thorough investigation into whether its employees and managers

12  committed harassment, discrimination and retaliation in the workplace.

13            To prove a harassment, claim in court:  (1) the plaintiff must show that the defendant

14  engaged in a course of conduct that was objectively and subjectively harassing, (21) the plaintiff

15  suffered some sort of harm as a result. This could include emotional distress, physical harm, or

16  financial losses and (3) the plaintiff would also need to show that they took reasonable steps to stop

17  the harassment, but the defendant continued anyway.

18            The applicable standard, as stated in *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57:

19  Title VII is violated when the workplace is permeated with discriminatory behavior that is

20  sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment,

21  *id.,* at 64, 67. This standard requires an objectively hostile or abusive environment--one that a

22  reasonable person would find hostile or abusive-as well as the victim's subjective perception that the

23  environment is abusive. Pp.21-22.  b) Whether an environment is "hostile" or "abusive" can be

24  determined, only by looking at all the circumstances, which may include the frequency of the

25  discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

26  offensive utterance; and whether it unreasonably interferes with an employee's work performance.

27  The effect on the employee's psychological well-being is relevant in determining whether the

28

COMPLAINT
PAGE  47 of 52

1  plaintiff actually found the environment abusive. But while psychological harm, like any other

2  relevant factor, may be taken into account, no single factor is required. pp. 22-23.

3      The Defendant's continual, prolonged "set-up" investigations into my alleged misconduct are

4  adverse employment actions, as I have sustained periods of depression, anguish and it materially

5  affects my job performance, mental and physical health, as in the language of in *Meritor Savings*

6  *Bank, FSB* v. *Vinson,* 477 U. S. 57: Title VII is violated when the workplace is permeated with

7  discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or

8  abusive working environment, *id.,* at 64, 67. This standard requires an objectively hostile or abusive

9  environment--one that a reasonable person would find hostile or abusive-as well as the victim's

10  subjective perception that the environment is abusive. Pp.21-22.

11      The U.S. Equal Employment Opportunity Commission (EEOC) recommends that employers

12  conduct prompt and thorough investigations in order to prevent discrimination and harassment from

13  occurring in the workplace. They also advise employers to take appropriate action if discrimination

14  or harassment is found to have occurred.  In addition, the National Labor Relations Board (NLRB)

15  has held that an employer's failure to timely investigate a complaint of discrimination or harassment

16  can be considered an unfair labor practice under the National Labor Relations Act.

17      Fuchs subjected to me to isolation from co-workers, exclusion from meetings and training,

18  denying me opportunity to collaborate with my co-workers, non-response to my e-mails including

19  suggestions for process and service improvements, and hostile one-on-one meetings.  Fuchs

20  continually sabotaged my suggestions for improvement by again attacking my communication as

21  unprofessional or inappropriate and found fault for how I presented my suggestions.  This behavior

22  is defined in the "Preventing Workplace Harassment" CBT training course for CCSF (City and

23  County of San Francisco) Supervisors as: "The gratuitous sabotage of a person's work

24  performance."

25      ASR Directors blocked me from using email to report these incidents and any

26  communication of disparate treatment was disparaged and labeled as accusatory without

27  investigation.  Their constant criticism of my communication style was harassment as it was

28  disparaging, repetitive and relentless.  This constant criticism of my communication is libelous and

COMPLAINT
PAGE  48 of 52

1   slanderous. The Department perpetuated a stigma around my communication that has had a severe

2   impact on my mental health, was unfair, biased, vicious and severely impacted my self-esteem.

3   Their standards were subjective and targeted to me solely in an attempt to justify their abusive,

4   retaliatory charges and retribution. Their behaviors were severe and pervasive enough to create a

5   hostile and abusive work environment and is considered harassment under Title VII of the Civil

6   Rights Act of 1964. I complained about this disparate treatment to ASR Management, ASR Human

7   Resources, my union, DHR EEO, without the Defendant taking action to correct, in contrast, I

8   suffered continued adverse employment actions. ASR Human Resources neglected to investigate

9   my complaints.

10          Defendants subjected me to discrimination, retaliation and harassment for opposing practices

11  prohibited by Title VII. The Defendant failed to act and take all reasonable steps to prevent

12  discrimination, retaliation and harassment from occurring. *See* Exhibit AI, attached and

13  incorporated hereinafter (SEIU Union Letter to the Board of Supervisors and Office of the City

14  Attorney regarding DHR EEO discriminatory practices).

15          The harassment and reprisal included, but was not limited to, increased scrutiny, numerous

16  investigations, suspensions and termination as more fully described above in the Statement of Facts.

17          The Department's prolonged investigations and adverse employment actions over my four

18  years of employment without "*Just Cause*" after I made complaints or raised concerns were

19  continued harassment.

20          I followed all City and County of San Francisco policies and procedures related to EEO

21  reporting and charges. The various City Department tasks with upholding and enforcing these

22  policies and procedures failed to protect me at all times: ASR Management, ASR Human

23  Resources, DHR EEO, Office of the City Attorney, MEA Union and Office of the Controller –

24  Whistleblower Division. The "*Report of San Francisco Independent Review for Mayor London

25  Breed*" authored by William Gould IV ("Gould") in June 2021, detailed DHR EEO as fundamentally

26  deficient and called out biased investigations. Gould's review implicated DHR EEO, the Office of

27  the City Attorney and the Civil Service Commission in defending the City with legal defenses

28  against those who made good faith charges of discrimination and retaliation.

COMPLAINT
PAGE  49 of 52

1    The City's Whistleblower program has been broken for years.  My meeting with

2    representatives in the Controller's Office, Whistleblower Division, were riddled with a "Whistling in

3    the Dark" conversation and a referral back to DHR EEO.  Complaints about the Whistleblower

4    process date back almost a decade with no change or improvement in the process.

5    *Ray v Henderson*, 217 F3d 1234 concluded "Harassment as retaliation for engaging in

6    protected activity should be no different — it is the paradigm of "adverse treatment that is based on

7    retaliatory motive and is reasonably likely to deter the charging party or others from engaging in

8    protected activity." EEOC Compliance Manual P 8008.  ". . .the Second, Seventh and Tenth Circuits

9    have held that an employer may be liable for a retaliation-based hostile work environment. *See*

10   *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2nd Cir. 1999)

11   ("coworker harassment, if sufficiently severe, may constitute adverse employment action so as to

12   satisfy the second prong of the retaliation prima facie case"); *Drake v. Minnesota Mining Mfg. Co.*,

13   134 F.3d 878, 886 (7th Cir. 1998) ("retaliation can take the form of a hostile work environment");

14   *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998) ("co-worker hostility or

15   retaliatory harassment, if sufficiently severe, may constitute adverse employment action' for

16   purposes of a retaliation claim").  We agree with our sister circuits. Harassment is obviously

17   actionable when based on race and gender.

18   Harassment is actionable only if it is "sufficiently severe or pervasive to alter the conditions

19   of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems*,

20   Inc., 510 U.S. 17, 21 (1993). It must be both objectively and subjectively offensive. See *Faragher v.

21   City of Boca Raton*, 524 U.S. 775, 787 (1998). To determine whether an environment is sufficiently

22   hostile, we look to the totality of the circumstances, including the "frequency of the discriminatory

23   conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

24   utterance; and whether it unreasonably interferes with an employee's work performance." Id.

25   (quoting *Harris*, 510 U.S. at 23). fostered animus in other employees whose working conditions

26   were affected. Other employees began to distance themselves from Ray, and some stopped talking to

27   him. In November of 1995, the difficulties at work rose to such a level that Ray took stress leave

28   from his job."

COMPLAINT
PAGE  50 of 52

1    When harassment is by the plaintiff's supervisor, an employer is vicariously liable, subject to
2    a potential affirmative defense. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). For
3    vicarious liability to attach the supervisor must be empowered by the employer "to take tangible
4    employment actions against the [plaintiff], *i.e.*, to effect a 'significant change in employment status,
5    such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or
6    a decision causing a significant change in benefits.'" *Id.* at 2443 (quoting *Ellerth*, 524 U.S. at 761).

7    As a direct and proximate result of Defendants' conduct, I have suffered injury, damage, loss
8    and harm, including but not limited to, loss of income, humiliation, embarrassment, severe mental
9    and emotional distress. I have suffered and continue to suffer mental and emotional distress,
10   including but not limited to depression, nervousness, anxiety and loss of self-worth, and damage to
11   my reputation.

12   The Defendant engaged in defamation of my character with libelous, false charges and
13   derogatory accusations on my motives and speech with intent to cause harm. The psychological
14   effects on me have been significant.

15   Defendants' actions directed at me were carried out by supervising employees acting in a
16   deliberate, callous and intentional manner in order to injure and damage me.

17   Defendant failed to take prompt action that was likely to end the harassment because
18   Defendant failed to investigate my complaints.

19   This conduct was unwelcome, and was sufficiently serious to change the conditions of my
20   employment and create an abusive or hostile work environment, and a reasonable person in these
21   circumstances would consider the environment to be abusive or hostile. I was harmed by this abusive
22   or hostile working environment.

23   I have suffered and continue to suffer economic damages, including lost wages and benefits
24   and other compensatory damages, damage to my professional reputation, legal and court expenses,
25   future earnings and benefits, humiliation, embarrassment with co-workers, friends, members of the
26   community and family, and anguish. As a further result of the acts of Defendant as alleged above, I
27   have suffered mental, emotional, and physical distress, have been damaged, and I continue to suffer
28   emotional distress.

COMPLAINT
PAGE 51 of 52

The conduct of Defendant as alleged above was a substantial factor in causing my harm, as described above. The conduct of Defendant and their employees as described herein was malicious and oppressive and done with a willful and conscious disregard for my rights. Consequently, I am entitled to punitive damages.

### Demand for Relief

I respectfully request the following relief:

1. Equitable relief, reinstatement of employment, back pay, retirement benefits and other employee benefits, including interest on these amounts,
2. Compensatory damages, emotional distress, humiliation, and mental anguish on all claims of relief,
3. Injunctive relief to stop the retaliatory behavior, including but not limited to harassment and adverse employment actions.
4. Legal, court and associated costs and fees as permitted by law,
5. Expungement of all adverse employment records,
6. City and County of San Francisco Policy Changes
7. Any other relief the Court deems proper.

✔ Punitive damages

*[Note this list does not include punitive damages. In certain cases, punitive damages may be awarded if the employer engaged in discrimination with malice, oppression, or reckless indifference to your rights under federal law. If this applies to your case, mark the box above, write in punitive damages, and make sure that the pages in your Complaint include facts to show that your employer acted with malice, oppression, or reckless indifference.]*

### Demand for Jury Trial

I demand a jury trial on all issues.

Respectfully submitted,

Date: _January 30, 2023_     Sign Name: _Veronica Tunucci_

Print Name: _Veronica Tunucci_

COMPLAINT
PAGE 52 of 52